# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

DAHUA TECHNOLOGY USA, INC.

    Plaintiff,

    v.

FENG ZHANG,

    Defendant.

Civil Action No. 18-cv-11147-IT

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE ODED SHENKAR

When Dahua Technology USA, Inc. ("Dahua") demoted Feng Zhang ("Zhang"), it offered, among other compensation, to pay him the remaining salary on his three-year contract, totaling $680,000. A scrivener's error made by an in-house attorney (then) employed by Dahua's Parent Company, Zhejiang Dahua Technology Co., Ltd. resulted in the final document stating that payments of $680,000 per month for 16 months would be paid despite the fact that the only discussions held called for a total payment of $680,000 over a period of 16 months. Zhang argues that this 16-fold increase in compensation was intentional. He further argues that, although he claims Dahua "underpaid" him by *over $600,000 per month*, he said nothing because of Chinese business culture.

In support of his argument, Zhang relies upon the proffered testimony of Oded Shenkar, a professor at Ohio State University. Mr. Shenkar is not an expert in contemporary Chinese workplace culture. Rather, he principally studies scholarship itself—the general study of international management studies. In the 1980s and 1990s, predating significant cultural and economic shifts within the country, Mr. Shenkar did write directly about Chinese workplace

culture. But, this work lacks relevance to the existing dispute. Likewise, much of the research he cites is from the wrong century, and therefore not an appropriate foundation for opinions about events in the late 2010s. Mr. Shenkar's report (<u>Exhibit A</u>) also omits key facts that undercut his already broad cultural theories about why Mr. Zhang would have been silent about  the extraordinarily large  underpayment Mr. Zhang alleges. Mr. Shenkar's testimony would not aid the trier of fact and Plaintiffs respectfully request that his reports be excluded from evidence and that he be prohibited from testifying.

## I.      Factual Background

Feng Zhang is a United States citizen who has lived in the United States since 1996. On November 9, 2015, Feng Zhang entered an agreement to serve as the Chief Strategy Officer and Vice President and President of North American and Enterprise Sales for Dahua, a U.S company. His three-year employment contract set an annual salary of $510,000.

Zhang underperformed, and in August of 2017, Dahua decided to remove him from his position. Dahua's chairman, Liquan Fu ("Fu"), discussed these changes with Zhang in person. Dahua offered Zhang severance totaling $680,000—the amount remaining on his contract—paid over the following sixteen months otherwise left on his contract. Dahua also offered him an outside consulting agreement with annual salary of $240,000. Zhang balked at being labelled an outside consultant and demanded continuing employee status for the consultant role. This and other terms were adjusted. In the course of revisions, the severance language was erroneously changed to: "monthly severance payments to [Zhang] in the amount of $680,000 for sixteen (16) months."

Dahua did not notice the drafting error (but it is disputed whether Zhang noticed it), and between August 2017 and January 2018, Dahua paid Mr. Zhang $42,500 per month, consistent

with the offer to pay the salary remaining on Zhang's contract. Zhang did not say anything to indicate this was incorrect.

In January 2018, Dahua decided to terminate Zhang from his consulting role, and Zhang engaged legal counsel. Only then did Zhang claim any entitlement to $680,000 per month. Dahua explained that this was a scrivener's error, but Zhang insisted that he was entitled to nearly $11 million in severance, forcing Dahua to seek a declaratory judgment.

## II.    Argument

Zhang now argues that, despite his annual compensation of $510,000, Dahua decided to give him severance of $10,880,000 even though it was also providing him with new salary compensation of $240,000 per year for two years and a cash award related to stock appreciation of approximately $250,000; that after making that agreement, Dahua underpaid him by *$637,500 per month*; and that Zhang chose not to address the underpayment situation *at all* because of Chinese business norms—and despite the fact that he was a U.S. citizen, a U.S. resident for over two decades, a U.S.-based employee of a U.S. company, and had agreed that disputes over compensation would be determined in this U.S. Court.

In service of this argument, he presents the opinion of Professor Oded Shenkar of Ohio State University. But Plaintiffs have not established that Mr. Shenkar has any basis to opine on the questions he purports to answer: (1) Whether nearly $11 million is reasonable severance for an underperforming executive; (2) whether, in the late 2010s, a U.S. citizen working for a U.S. company would follow Chinese workplace culture, and (3) whether, in the late 2010s, Chinese workplace culture forbade intracompany conflict so completely that a person underpaid by over $600,000 per month would be completely silent about the issue "from August 2017 through

January 2018." Exhibit A, 16. Mr. Shenkar is not an expert in these areas, and he has cherry-picked facts to fit an outdated paradigm.

Plaintiffs therefore cannot meet their burden for admissibility. To be admissible at trial, experts must be qualified, and their testimony must both rest on a reliable foundation and be relevant to the task at hand. *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, 989 F. Supp. 2d 165, 171 (D. Mass. 2013) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)). "[A]n expert must be qualified to testify based on the expert's knowledge, skill, experience, training or education." *Poulis-Minott v. Smith*, 388 F.3d 354, 359 (1st Cir. 2004). The submitting party "must show by a 'preponderance of proof' that the expert has used a 'sound and methodologically reliable' reasoning process to reach his or her conclusion[.]" *Calisi v. Abbott Labs.*, Civil Action No. 11-10671-DJC, 2013 U.S. Dist. LEXIS 139257, at *16 (D. Mass. Sep. 27, 2013). Even if the expert is otherwise qualified, his or her specific opinions regarding the case must "rest[] on a sufficiently trustworthy foundation." *United States v. Tavares*, 843 F.3d 1, 3 (1st Cir. 2016). "An 'analytical gap' between the data and the opinion proffered' may provide the basis for the expert's exclusion. This requirement, which is sometimes described as 'fit,' ensures that the connection between the expert's data, his conclusions, and the facts of the case is reliable." *Lawes v. CSA Architects & Eng'rs LLP*, 963 F.3d 72, 98-99 (1st Cir. 2020) (quoting *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 32 (1st Cir. 2012)).

### A.    Mr. Shenkar Is Not a Severance Expert, and Ungrounded Speculation Is Not Expert Analysis.

Mr. Shenkar speculates that Dahua would have paid Zhang $11 million in severance because of certain events, largely involving Dahua's Chinese parent company, Zhejiang Dahua Technology Co., Ltd. ("Zhejiang"). Most importantly, Mr. Shenkar is not—and does not purport

4

to be—an expert in executive compensation or severance packages. This should be the end of the matter.

### 1.     Mr. Shenkar Provides a Rubberstamp, Not Analysis.

Undeterred by his lack of expertise, Mr. Shenkar makes unfounded guesses that certain events *exponentially* increased the amount of severance that Dahua was willing to offer an underperforming executive—from $680,000 (in the original draft agreement) to over $10 million. He writes, for example:

> Think, for instance, of the potential damage to Dahua should Mr. Zhang decide to jump over to Hikvision at the time Dahua was negotiating the strategically vital acquisition of Lorex (2017-beginning of 2018). Or, think of the harm of Mr. Zhang disparaging Dahua to would be customers or the US government as it relates to the backdoors written into the coding for Dahua's cameras.

*Id.* at 11.

As an initial matter, Mr. Shenkar's opinion relies upon collapsing the distinction between Dahua and its parent company, Zhejiang Dahua Technology Co., Ltd. ("Zhejiang"). This Court already found: "Zhejiang is not a party to the 2017 Employment Agreement." Document No. 98, Memorandum and Order, 5 (May 26, 2021) (denying Zhang's motion to amend his complaint). Mr. Shenkar entirely confuses the two corporate entities and uses "Dahua" indiscriminately to refer to both of them. *See, e.g.*, Exhibit A, 8 (stating, for example, that Dahua was "blacklist[ed] by the US government"; the blacklisting related to the parent, not the subsidiary). This—perhaps deliberately—muddies the issues. The present dispute is with Dahua, not Zhejiang. Through Mr. Shenkar, Zhang once again asks "the court to disregard the presumption of corporate separateness between the two entities." Docket No. 98 at 1-2.

Moreover, Mr. Shenkar hides behind equivocal language, merely instructing his readers to "think of" these topics for themselves. He does not provide any assessment of the value of

those risks, or any analysis of how severance packages in the relevant industry reflects such risks. Yet he offers the opinion: "A payment to Zhang in the order of magnitude of $10 million for a severance that included confidentiality, non-disparagement, non-competition and release clauses (including Zhang's stock) ***would be expected*** as among other things the perceived damage to Dahua for Zhang going to a competitor or revealing confidential information was critical[.]" *Id.* at 21 (emphasis added).

He does not provide any explanation of why $11 million "would be expected." The $10 million valuation is guesswork at best; more likely, Mr. Shenkar is merely rubber-stamping Zhang's argument. Either approach warrants excluding such evidence from trial. *See*, *e.g.*, *Damon v. Sun Co.*, 87 F.3d 1467, 1474 (1st Cir. 1996) (". . . an expert should not be permitted to give an opinion that is based on conjecture or speculation from an insufficient evidentiary foundation.") (quoting *Van Brode Group, Inc. v. Bowditch & Dewey*, 36 Mass. App. Ct. 509, 633 N.E.2d 424, 430 (Mass. App. Ct. 1994)); *Iconics, Inc. v. Massaro*, 266 F. Supp. 3d 461, 469 (D. Mass. 2017) ("An expert is responsible for ensuring that his opinion is based on reliable data; he may not blindly rely on his client's representations.") (citing *SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 25 (1st Cir. 1999)); *Rand A Tech. Corp. v. Parametric Tech. Corp.*, No. 03-CV-11046-MEL, 2005 U.S. Dist. LEXIS 47964, at *1 (D. Mass. Oct. 19, 2005) ("An expert must do more than simply rely on a client's representations."). If the scrivener's error had somehow reflected severance for $50 million, Mr. Shenkar would not have to change *anything* in his analysis to support severance for $50 million. His conclusion is unbound from any facts, and any true analysis.

6

2. **Actual Experts Explain Flaws in Mr. Shenkar's Claim.**

Mr. Shenkar's rubberstamp is contradicted by the rigorous analysis of Marsha Cameron.

Ms. Cameron is the "Managing Partner and Co-Founder of Paradox Compensation Advisors,

LLC", and she has "been a leader in the compensation field for over thirty-five years." Exhibit B,

Marsha Cameron Expert Report, p. 3. She explains:

> Paradox has significant experience determining approximate reward structures and terms
> of employment for executives in public, for-profit, subsidiary, and private companies. I
> have chaired two public company compensation committees and understand the
> expectations that shareholders and the Stock Exchanges have of public companies. I have
> also chaired one public company nominating and governance committee. In a U.S. public
> company, the compensation and nominating and governance committees work together
> on terms of employment, termination, and severance for top executives. [] Over the past
> 35 years, I have played a consulting, management or board role in the development and
> interpretations [of] hundreds of executive contracts, including termination provisions.
> During the timeframe between 2016 and 2018, I reviewed at least 40 contracts and/or
> terms of employment at the senior executive level.

*Id.* at pp. 3-4.

Ms. Cameron reports: "Based on our independent analysis, as well as documents and

other information reviewed, it is my opinion that Mr. Zhang's claim for severance in the amount

of $10,880,000 is wholly unreasonable and unprecedented in comparison to industry norms." *Id.*

at 1-2. The basis for Ms. Cameron's opinion, as further detailed in her report, is "publicly

available information on employment and severance agreements in companies comparable to

Dahua USA in terms of size and/or industry," "executive severance practices reported in surveys

covering the broader universe of companies during the period from 2016-2018," "high profile

CEO terminations during 2017 for which public information is available," and Ms. Cameron's

own "experience with companies where [she] served as a consultant or member of the board of

directors between 2016 and 2018[.]" *Id.* at 5.

Although Mr. Shenkar was wrong to focus on Zhejiang instead of Dahua, Ms. Cameron reviewed data regarding Chinese executive compensation. Exhibit C, Marsha Cameron Reply Report. She found: "Across the board, Chinese executives are paid less than US executives. . . . In today's dollars, median total cash for a technology company CEO in the US is $600K whereas medial total cash in China is $386K Since cash termination benefits are almost always a multiple of cash compensation in both China and the US, our US-based benchmarking gave Mr. Zhang a huge advantage in the calculation of what is normative." *Id.* at 3. As for Mr. Shenkar's assertion that Zhejiang's blacklisting prompted a $10,880,000 severance payment, Ms. Cameron writes: "[T]here is no publicly available information that Dahua's most direct competitor (Hikvision) or other Chinese companies placed on the blacklisted Entity List during the same timeframe as Dahua provided cash severance of $10,000,000 as consideration for confidentiality, non-disparagement, non-competition, and release claims." Exhibit D, Marsha Cameron Rebuttal Report, 2.

Mr. Shenkar's speculation is also contradicted by the opinion David Gilbert, an HR executive who has served in multiple China-based roles, including during the timeframe at issue. Exhibit E, David Gilbert Report, 1-3. From 2013-2017, he had HR oversight for Under Armour subsidiaries in China, Europe, and Latin America. *Id.* at 1-2. From 2018 to the present, he led global HR functions for HZO, Inc., including over manufacturing processes in China. *Id.* at 2; *see also* Exhibit F, David Gilbert Reply Report (further discussing qualifications). Mr. Gilbert wrote that, in China, the standard severance is one month's salary for each full year of service, plus one additional month of salary. *Id.* at pp. 4-5.

In response to Mr. Shenkar's risk-based argument, Mr. Gilbert wrote:

In my own experience, where companies (including Chinese companies) sought to prevent a "high value" department executive from immediately joining a competitor, it

was not uncommon to offer, in lieu of a lump-sum severance payment, some form of salary continuation, either by means of "garden leave" or a post-employment consultancy agreement [like the one Dahua offered Zhang]. Regardless of the mechanism, it has been my experience that salary continuation typically lasted no more than 3 to 6 months; in a few rare instances, where the company felt the need to offset risk for a longer period of time, the salary continuation extended to 12 months. . . . [S]everance agreements for senior Chinese executives never approached an amount corresponding to 21x one's annual salary.

Exhibit G, David Gilbert Rebuttal Report, pp. 2-3.

Finally, expert Kent Kedl contradicts Mr. Shenkar's $11 million severance opinion. Mr. Kedl has been working in China since 1988. Exhibit H, Kent Kedl Expert Report, 1. He is the head of Control Risks for Greater China and North Asia. Control Risks is "a risk management consulting firm" with specialty in "company investigations and operational restructuring, exiting members of a senior management team and helping the company continue to seamlessly run their business operations." *Id.* He writes: "At a conservative estimate, in the past five years, I have been involved in over 40 situations where a senior business leader is removed, and a termination settlement has been reached. All of these cases have been with Chinese employees working for a company in China." *Id. See also* Exhibit I, Kent Kedl Reply Report (further discussing qualifications).

Mr. Kedl writes that Mr. Shenkar's justification based on the risk of whistleblowing "to be contrary to what is *actually* happening on the ground in China today." Exhibit J, Kent Kedl Rebuttal Report, 3. "Whistleblowing is not a rare circumstance in China and does not justify a settlement inflated to the level claimed by the plaintiff. Whistleblowing is certainly in the background of every settlement, but we're only seeing maximum settlements in the 2x annual base compensation range." *Id.* at 4. Likewise, regarding Mr. Shenkar's claim that the $11 million severance was needed for a non-compete arrangement, Mr. Kedl explains that "a non-compete agreement (NCA) is nearly always sought from a departing employee" and "A figure of over 21x

9

annual salary, as claimed by the plaintiff, is unbelievably higher than a normal settlement for an NCA." *Id.*

### 3.    Mr. Shenkar Is a Vehicle for Prejudice and Hearsay.

Mr. Shenkar's rubberstamp of the nearly $11 million severance is not reliable. Instead, Zhang seeks to use Mr. Shenkar as a backdoor mechanism to put hearsay and prejudicial information before the Court regarding Dahua's parent company—which is further grounds for exclusion. *See United States v. Ortiz*, 119 F. Supp. 3d 15, 17 (D.P.R. 2015) ("Even if expert testimony is admissible pursuant to Fed. R. Evid. 702, it may be disallowed pursuant to Fed. R. Evid. 403 if its probative value is substantially outweighed by factors such as unfair prejudice, confusion and undue delay.") (denying expert appointment because of danger of prejudice).

Mr. Shenkar writes, for example, of "Revelations in 2017 concerning third party and vendor ability to hack into installed equipment via a backdoor, written into the coding, exposing a national security as well as a crime risk, and failure to disclose the vulnerabilities in real time. This allowed the Chinese government to spy using Dahua's cameras." Exhibit A, p. 9. This is not only prejudicial, but has no relevance to the case at hand. Mr. Shenkar attempts to squeeze it in by claiming: "The company wide role also demonstrates that Zhang had intimate knowledge of the Company's operations the world over, including of its competitive position, strategy, and pending transactions . . . . , pending government actions . . . , and potential sales transgressions[.]"*Id.* at p. 19. But this is entirely unfounded. Zhang's job title does not "demonstrate" "intimate knowledge" of prejudicial facts regarding Dahua's parent company (let alone that this prompted nearly $11 million in severance).

The statement is also hearsay. Because this allegation is completely irrelevant, it is not found in the case record. Instead, Mr. Shenkar "supports" it with footnotes that identify news

articles. *See One Beacon Ins. Co. v. Electrolux*, No. 03-12232-MBB, 2009 U.S. Dist. LEXIS

143225, at *72 (D. Mass. Feb. 3, 2009) (comparing product safety report to newspaper article,

noting the latter "itself constitutes inadmissible out-of-court statements, by unidentified persons,

offered to prove the truth of the matter asserted") (quoting *Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir.

1993)); *see also Staniewicz v. Beecham, Inc.*, 687 F.2d 526, 529-30 (1st Cir. 1982) (requiring an

exception to the hearsay rule to be shown before a magazine article discussing corporate

commercial policy could be admitted); *Pallotta v. United States*, 404 F.2d 1035, 1036 (1st Cir.

1968) (newspaper article, being hearsay, "clearly unusable" to prove the facts asserted therein).

**B.    Mr. Shenkar Is Not an Expert on Contemporary Chinese Workplace or Emigrant Culture.**

Mr. Shenkar, who has other academic focuses, is not an expert on contemporary Chinese

workplace culture or emigrant culture. Last year, he co-authored an article titled "The Impact of

Country-Dyadic Military Conflicts on Market Reaction to Cross-Border Acquisitions." Exhibit

K, Shenkar Curriculum Vitae, 12. He has a forthcoming article titled "How Host Country

Reputation Differentials Influence Market Reaction to International Acquisitions." *Id.* at 12.

Additionally, for approximately twenty years, Mr. Shenkar has substantially focused on an

abstract study of international business management scholarship. In 2004, he co-authored

"Handbook for International Management Research" (*id.* at 10) and he has a forthcoming

publication titled "Neglected Elements: What We Should Cover More of in International

Business Research." *Id.* at 11. Mr. Shenkar's work would not aid the Court in determining

whether a person who emigrated in 1996 would follow Chinese business norms twenty years

later, or whether Chinese workplace culture requires silence in face of a multi-million dollar

underpayment.

Most of Mr. Shenkar's own work regarding Chinese workplace culture is decades old. In 1990, he published an article titled "Management in China: Challenges and Obstacles." *Id.* at 11. In 1991, he published an article titled "Chinese Management: Reforms and Obstacles" and edited the book "Organization and Management in China 1979-1990." *Id.* at 11, 20. But this case is not about Chinese workplace culture of the 1980s.

Mr. Shenkar's expert reports do not provide <u>any</u> information about what, if anything, he has done to become an "expert" about Chinese workplace culture or the Chinese emigrant experience in the late 2010s. To the contrary: Mr. Shenkar's heavy reliance on publications from the 1980s and 1990s (discussed below) strongly indicates that his knowledge is stale, and confirms that he is not an expert on the questions in this case.

Where Zhang has failed to provide evidence that Mr. Shenkar is not qualified to opine about those questions as an expert, he must be excluded. *Richmond Steel, Inc. v. Puerto Rico Am. Ins. Co.*, 954 F.2d 19, 22 (1st Cir. 1992) (approving lower court's exclusion of expert witness because ten years had elapsed since expert had done work similar to matter on which he would testify). "An expert may be properly excluded if his experience or education in the field is outdated." *Penor v. Columbia Cty.*, No. CV 08-1114-HU, 2010 U.S. Dist. LEXIS 22312 at *6 (D. Or. Mar. 9, 2010). Mr. Shenkar's "qualifications are outdated and that his recent educational activities in the field are insufficient to qualify him as an expert." *Id.* (excluding an expert where, inter alia, his most relevant work in the field only occasionally involved the particular subtopic on which he would testify and it had been more than fifteen (15) years since he was knowledgeable in that role); *see also Rosado v. Deters*, 5 F.3d 119, 124 (5th Cir. 1993) (finding no abuse of discretion in lower court excluding an accident reconstructionist last qualified as such twenty-five years before trial). Mr. Shenkar lacks sufficiently recent expertise to inform his

opinion, and "[u]nless the witness's opinions are informed by expertise, they are no more helpful

than the opinions of a lay witness." *United States v. Shay,* 57 F.3d 126, 133 (1st Cir. 1995).

### C.      Outdated Research Is Not a Reliable Foundation for Expert Testimony.

Consistent with Mr. Shenkar's own research shift approximately twenty years ago, half of

the sources that Mr. Shenkar relies upon were published before 2003. For example, Mr. Shenkar

writes that "Evidence shows limited cultural transformation even among second and third

generation Chinese immigrants," and then cites a study from 1990—***twenty-seven years*** before

Zhang allegedly did not complain about being underpaid by $638,500 every month. Exhibit A,

Shenkar Report, 13.

Mr. Shenkar writes: "[A]ggression, or even a hint thereof, towards authority figures is

especially frowned upon," citing research on "socialization patterns" from **1985**. *Id.* at 15. He

continues: "According to Bond and Hwang (**1985**, a summary of Chinse face behavior),

preserving the face of those high on power and status can help obtaining help from an allocator

of resources. This too would explain why a complaint was not made[.]" *Id.* at 17. But no research

from 1985 can explain why Zhang did not complain in 2017.[1]

Incredibly, Mr. Shenkar hand-waves these problems by asserting that "evidence shows

little if any change in cultural patterns over time." *Id.* at 13. This contention is not only patently

---

[1] *See also, e.g.*, *id.* at 15 ("The role of cultural beliefs and values (Leung, **1995**, covering Chinese psychological, social, and environmental beliefs) as well as processed of causal attribution are in and of itself culturally variable (e.g., Crittenden, **1995**, summarizing prior research on attributional processes among the Chinese), which I take into account when it comes to analyzing how actors have enacted the context of the events at hand[.]") (emphasis added); *id.* at 15 (Mr. Shenkar also describes his opinion as addressing "Chinese interpersonal norms (see Shenkar & Ronen, **1987b**, described earlier in relation to negotiations) as opposed to the broader cultural lineup (e.g., Shenkar & Ronen, **1987a**, a statistical rank analysis of work-related values across Mainland China, Hong Kong, Taiwan, and Singapore)," claiming that "those directly relate to the interaction between individual actors, in this case, Fu and Zhang.") (emphasis added).

absurd; it is contradicted by Zhang's other expert witness, Oxford professor Mimi Zou, who

writes:

> Chinese society has also undergone significant changes in recent decades of economic
> reform. Chinese companies have become more exposed to the management,
> organizational, and employment practices of other countries as China opened its domestic
> market to foreign businesses and an increasing number of Chinese companies have
> engaged in diverse types of investments abroad.

Exhibit L, Mimi Zou Report, ¶ 22.

Mr. Shenkar's belief that China has not changed simply cannot survive the facts, as set

forth in the rebuttal of expert Kent Kedl. Mr. Kedl explains: "Chinese labor contract law was

amended in 2013 to, in part, increase the rights of an employee against an employer in

dismissals, making it very difficult to fire an employee without paying a severance

compensation. This amendment changed what, functionally in China, was an 'at-will'

employment environment into one that greatly favored employees under contract." Exhibit J,

Kedl Rebuttal Report, p. 2. Kedl continues: "Even when there is no animosity between

management and those being dismissed, in every situation I have faced, employees have not

waited for management 'to do the right thing' but, instead, have confronted the company –

sometimes aggressively – to get a better settlement." *Id.*

As both Ms. Zou and Mr. Kedl confirm, research from the 1980s and 1990s is not a

reliable foundation for discussing workplace behavior in the late 2010s.

**D.      Mr. Shenkar's Analysis Does Not Fit the Facts.**

Mr. Shenkar claims that "[s]ubordinates in China are not expected to argue for their

rights too aggressively" and "[c]onfrontation and conflicts are to be avoided." *Id*. at 20. But

Zhang alleges that he *did* confront Mr. Fu both indirectly, through the human resources

department, and directly, face-to-face. *See* Exhibit M, Zhang Dep. Tr. at 160-61 (discussing

interaction with an HR manager), *id.* at 188:2-17 ("Q: Did you tell that to Mr. Fu? A: I reject the contract. I told them I didn't like it, both Ms. Yue sitting there, Mr. Fu standing … I just walk out the door. Q: That's the way you recall explaining your concerns to Mr. Fu and Haiyan Yue? A: Yeah. I said, we – how do you want me to react? In the morning, we talk about everything happy, I'm still trying to help the company, help my team, and the very late in the day you give me something, trying to trick me.").

Mr. Shenkar's testimony is unreliable and should be excluded. "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Sullivan v. NFL*, 34 F.3d 1091, 1105 (1st Cir. 1994) (quoting *Brooke Grp. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242, (1993); *see also Wetmore v. Macdonald, Page, Schatz, Fletcher & Co., LLC*, No. 06-26-P-S, 2007 U.S. Dist. LEXIS 82943, at *13 (D. Me. Nov. 7, 2007) (noting that if an expert's "opinion is contradicted by undisputed facts in the record or that it has insufficient factual support" it should be excluded). Mr. Shenkar, examining only select events in this case to support his opinion, draws a conclusion plainly undercut by a cursory review of the record. When an expert prepares his opinion in this manner, that expert fails to reliably apply the principles and methods of his expertise to the facts of the case, and a court should exclude that opinion. *See* Fed. Rules Evid. R. 702(d); s*ee, e.g., G.G. Marck & Assocs. v. United States*, No. 08-00306, 2015 Ct. Intl. Trade LEXIS 66, at *38 (Ct. Int'l Trade June 17, 2015) (excluding two experts whose testimony was in direct conflict with apparent facts).

## CONCLUSION

The Plaintiff respectfully requests that this Court exclude Mr. Shenkar's reports and testimony from this case, and enter such other and further relief as is just.

Respectfully submitted,

DAHUA TECHNOLOGY USA, INC.,

By its Attorneys,


_/s/ Daniel E. Rosenfeld_____
Daniel E. Rosenfeld (BBO No. 560226)
drosenfeld@sullivanlaw.com
Erika L. Todd (BBO No. 689053)
etodd@sullivanlaw.com
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, MA  02109
(617) 338-2800

Dated September 2, 2021


### CERTIFICATE OF SERVICE

I, Erika L. Todd, certify that on September 2, 2021, this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF and paper copies will be sent to any indicated as non-registered participants.

_/s/ Erika L. Todd_____