**EXHIBIT A**

### Expert Report of Professor Oded Shenkar

Prepared for:

United States District Court, District of Massachusetts
Dahua Technology USA, Inc. v. Feng Zhang
Civil Action No. 1:18-cv-11147-IT

Dr. Oded Shenkar
Title: Ford Motor Company Chair in Global Business Management, Professor of Management and Human Resources, Academic Director of the National Center for the Middle Market, Fisher College of Business, the Ohio State University; member of the Institute for Chinese Studies, East Asian Studies Center, the Ohio State University
Address: 2100 Neil Ave, Columbus, OH 43210
Tel. 614-804-4690    Email: shenkar120@gmail.com.

Expert Report of Oded Shenkar
Dahua Technology v. Feng Zhang
Dated: May 24, 2021
Page: 2

## Table of Contents

I Witness' qualifications.................................................................................................... 3

II Witness' compensation.................................................................................................. 4

III Witness' prior expert opinions (N/A - none in the last four years) ............................. 5

IV Exhibits ....................................................................................................................... 5

V Facts of this case.......................................................................................................... 5

V(a) Facts obtained from court documents....................................................................... 5

V(b) Facts obtained/ compiled from public sources.......................................................... 8

VI Statement of opinion................................................................................................... 11

Expert Report of Oded Shenkar
Dahua Technology v. Feng Zhang
Dated: May 24, 2021
Page: 3

## I. Witness' Qualifications

1. My name is Oded Shenkar. I am the Ford Motor Chair in Global Business Management, and a tenured Professor of Management and Human Resources at the Fisher College of Business, the Ohio State University. I am also a member of the Ohio State University's Institute for Chinese Studies, situated at the East Asian Studies Center.

2. I hold MPhil and PhD degrees in sociology from Columbia University, combining business & Chinese studies. I was the first doctoral student at Columbia to qualify in Chinese Sociology, and wrote a PhD dissertation on the Chinese bureaucracy. I also hold a degree in East Asian (Chinese) Studies, cum laude.

3. I have an extensive background of China related business research, spanning over four decades. In recognition, I am one of a handful of scholars to be awarded the *Award for Distinguished Scholarly Contribution to Chinese Management Research* by the International Association of Chinese Management Researchers (IACMR, 2017).  I am also one of only 20 scholars worldwide to receive the *Gold Medal in International Business Research* from the Academy of International Business (AIB, 2019), and hold the highest combined citation ranking in culture research of any scholar worldwide (BAR, 2017). I am a Fellow and Past Vice President of the AIB.

4. I provided testimonies before the US-China Economics and Security Review Commission of the US Congress and was often called upon for advice. I furnished policy advice to US government officials at the (federal) cabinet and governor levels, and held discussions with Chinese government officers and delegates.

5. I have taught at the leading universities in Mainland China, e.g., Peking, Tsinghua and Sun Yat-sen, as well as at the CCP School; I have also taught or lectured in virtually all of Hong Kong SAR universities, e.g., the Chinese University of Hong Kong, the Hong Kong University of Science and Technology, and Hong Kong University.

Expert Report of Oded Shenkar
Dahua Technology v. Feng Zhang
Dated:  May 24, 2021
Page:  4

6.  I have served as an advisor to major Chinese (private, state-owned, township and village enterprises, joint ventures, wholly owned foreign subsidiaries), US and third country firms on topics ranging from strategy to human resource management, with a special emphasis on cultural issues. For example, upon the announcement of that deal, I was invited by Geely to provide advice on overcoming cultural obstacles in its acquisition of Volvo.

7.  I am the author of number of scholarly and trade books on China, reviewed by major media (e.g., the *Economist*) and cited by opinion leaders (e.g., Tom Friedman) as well as a coauthor of a book on culture. I am among the most published academic authors on China (close to half of 120 plus articles) and on culture. My work has been cited in the major Chinese (e.g., *China Daily, China Global Television Network*), US (e.g., the *New York Times, the Los Angeles Times*), and third country (e.g., the *Economist, Financial Times)* media outlets (see attached CV for a list).

8.  I am a past member of the Conference Board Council of Integrating Executives, focused on mergers and acquisitions. As the only academic on the Council, I provided inputs concerning the interface between culture and strategy as well as organizational issues in such transactions.

*   **Please refer to the attached CV for a list of publications and other relevant information (e.g., sample clients, media, etc.)**

## II Witness' Compensation

9.  I am being compensated for my services in this matter at an hourly rate of $600 for report preparation, and $800 for trial and deposition testimony.

## III Witness' Prior Expert Opinions

10.  I have not testified as an expert at trial or by deposition during the past four years, I have provided expert testimonies before that.

## IV Exhibits

11.  Mr. Zhang's affidavit is included as Exhibit A.

Expert Report of Oded Shenkar
Dahua Technology v. Feng Zhang
Dated: May 24, 2021
Page: 5

## V Facts of this Case

## V(a) Facts obtained from court documents – briefs of the parties and the appendix from the Court of Appeals for the First Circuit

1. Zhang signed an employment agreement with Dahua's parent company, Zhejiang Dahua Technology Co. on November 9, 2015. He was appointed as the parent's Chief Strategy Officer and Vice President, and as its U.S. subsidiary's President of North American and Enterprise Sales. The contract began on January 1, 2016 and bound the parties for three years. Zhang's compensation was set at $510,000 per year, with a grant of 100,000 shares of stock in the parent company. The contract contained no requirements for confidentiality, non-disparagement, non-competition or any release of claims and guaranteed Zhang's salary for the full three years (except in the event he was terminated for company misconduct).[1]

2. During his employment with Dahua, Zhang increased Dahua's revenue by approximately $1 billion and he saved the US subsidiary from a shortfall of tens of millions of dollars.[2]

3. Dahua initially did not pay the required salaried amount for Zhang in 2016, and only paid $193,165.34 of his guaranteed $510,000 salary. The evidence indicates that Zhang did not complain about the late payment, and received the remainder of his owed 2016 salary in February 2017.[3] Dahua also failed to pay Zhang his full salary during the first half of 2017, and paid him "Retro Pay" in July 2017 in the amount of $142,083.33. The evidence shows Zhang did not complain about those late payments.[4]

4. Dahua made the decision to remove Zhang from his position in August 2017. Dahua's lawyers prepared a document discussing factors surrounding the company's concerns about how to manage Zhang's termination, including the potential that he could expose the company's secrets, become a whistleblower, lower company morale and raise claims against the company such as breach of contract or wrongful termination. That document acknowledges that Dahua recognized it would have to pay Zhang's

---

[1] A84
[2] A134-135, 191
[3] A106, 1616-1617
[4] A1569-1683

Expert Report of Oded Shenkar
Dahua Technology v. Feng Zhang
Dated: May 24, 2021
Page: 6

remaining salary, as well as provide benefits for the remainder his employment agreement, and it
addressed the need to pay Zhang additional compensation for his release of claims against the company.[5]

5.  Fu traveled to the US with Haiyan Yue (in-house counsel), Lynette Lv (human resources) and others for
    the sole purpose of negotiating Zhang's departure.[6]  Zhang picked only Fu up at the airport and Fu sat in
    the backseat for the ride to the hotel.[7]

6.  The next morning, at Fu's hotel, Fu offered Zhang the opportunity to work at the home office in China.
    Zhang declined citing his family was settled in the US.  Fu and Zhang came to terms on an agreement for
    Zhang to stay on as a US-based internal consultant for two years.[8]

7.  Later that day, Fu offered Zhang a proposed severance agreement of $680,000. That proposed
    agreement included a 16-month non-compete in both the US and China, a non-disparagement clause,
    confidentiality obligations, and a "claw-back" of Zhang's severance in the event Zhang breached the
    agreement. Dahua claims Zhang rejected the agreement over his concern that the two-year consultancy
    was not guaranteed for the full two years.  Zhang claims he rejected the agreement because Dahua already
    owed him $680,000 plus almost $1 million in stock free and clear.[9]

8.  After rejecting the first offer, Zhang met with Lynette LV, the human resources executive Fu brought
    with him from China, and said: "I'm going to publish my experience.  That – I can sell that for millions,
    millions of dollars."[10]

9.  Fu, accompanied by his in-house counsel, later presented Zhang a revised severance agreement, which
    provided for Dahua making monthly severance payments to Zhang of $680,000 per month for each of
    sixteen months, amounting to approximately $10.8 million.[11]  Fu and Zhang both signed this agreement
    on August 28, 2017. Fu and Zhang also executed a two-year employment contract for Zhang to serve as

---

[5] A386-388
[6] A114, 134, 404
[7] A114–116
[8] A117
[9] A1649
[10] A134
[11] A18

Expert Report of Oded Shenkar
Dahua Technology v. Feng Zhang
Dated:  May 24, 2021
Page:  7

an internal consultant, compensated at $240,000 per year. Finally, Zhang also signed a Proprietary Information, Inventions Assignment, Non-Solicitation, and Non-Competition Agreement on the same day.

10.  Dahua paid Zhang monthly payments of $42,500 from August 2017 to January 2018. Zhang did not complain that the payments were too low. Zhang testified that his reason for remaining silent was that he did not want to jeopardize his future with the company and he expected Dahua to do the "right thing" and pay the required amounts.[12]  Zhang further testified that Chinese cultural considerations prevented him from complaining about the low payments.[13]

11.  In November 2017, Fu instructed Zhang to go to China, where he met with Fu and was given a cash payment of 1.6 million yuan (around $240,000). According to Zhang's account, Fu told him that the money constituted appreciation of the Zhang's company stock, and not the base value of the stock, and Fu told Zhang the cash payment was post-tax.[14]

12.  Zhang is from Shanxi.[15]  Zhang was socialized in China during his formative years and well beyond the generally accepted socialization threshold (up to 14 years of age), including his undergraduate university education.[16]

## V(b) Facts obtained from publicly available sources

Not listed in the court documents are a number of key events that are available from public sources and, in my opinion, provide a crucial backdrop for the events described in the court documents. The information below was put together from a variety of open sources, such as newspapers, news websites, technical publications, government announcements, and the like.  Also reviewed were the Company's last three Annual Reports (2018-2020) and press releases. For instance, the reports were reviewed for the listing, or lack of, of what one would consider relevant risk factors, such as, but not limited to, political risk, namely the potential for adverse

---

[12] A43
[13] A126, 140-141
[14] A140-141
[15] Exhibit A, A956
[16] A955-956

Expert Report of Oded Shenkar
Dahua Technology v. Feng Zhang
Dated: May 24, 2021
Page: 8

government action in key markets, a commonly listed risk factor for international companies; geopolitical risk, pertaining to the dependence of the relationship between China and a country which is a key market; human rights concerns, which could trigger an adversative government and or a client and would-be-client reaction; technical vulnerabilities of the Company's equipment; and potential changes in leadership, material in the case of any senior office holder, especially a founder CEO. Seeking such information is consistent with my firm belief that cultural processes do not take place in a vacuum and must be considered within the business context in which they are implanted.

The following are the main points of notice:

1.  Dahua Technology is a Chinese company, founded, headquartered, operated and controlled from China. Dahua is partially state owned, and the state has recently increased its ownership stake.[17]

2.  The events described in this litigation took place at a time when relations between the US and China have been deteriorating rapidly. As a partially state-owned enterprise (SOE) in a sector flagged for its national security ramifications, Dahua was especially vulnerable to US government actions.

3.  Dahua's involvement in providing, installing and operating of surveillance equipment in Xinjiang was a major vulnerability even before it has been alleged that it has developed software that could identify ethnic features, just at a time when the US and other countries have become especially sensitive to ethnic discrimination.[18]

4.  Dahua's blacklisting by the US government and the resulting loss of major customers in the US (all government agencies plus any entity supported with federal $).[19]

---

[17] https://ipvm.com/reports/china-mobile-dahua?code=allow
[18] https://ipvm.com/reports/dahua-strong-sanction; https://ipvm.com/reports/dahua-uyghur; https://techjournalism.medium.com/how-xinjiang-linked-chinese-surveillance-equipment-is-stealth-sold-in-europe-dodging-detection-69486e9a70b; https://www.latimes.com/business/technology/story/2021-02-09/dahua-facial-recognition-china-surveillance-uighur; https://www.nytimes.com/2019/10/07/us/politics/us-to-blacklist-28-chinese-entities-over-abuses-in-xinjiang.html.
[19] https://uscode.house.gov/statutes/pl/115/232.pdf; https://www.foreign.senate.gov/imo/media/doc/04-03-19%20RM%20Rubio%20Letter%20to%20Pompeo%20Mnuchin%20Ross%20re%20Uighur%20detentions.pdf

Expert Report of Oded Shenkar
Dahua Technology v. Feng Zhang
Dated: May 24, 2021
Page: 9

5.  Snowballing repercussions among US allies, e.g., Australia and the UK, where the US blacklisting prompted close scrutiny of the firm on the part of government agencies, later extended to private firms (e.g., Bosch).

6.  The addition of Dahua to the US export control list, undermining its ability to obtain key technology and components potentially critical for upgrades and new product development. Also, Dahua's 2018 Annual Report states that overseas revenue was viewed as a "vital" factor for future revenue to increase.[20]

7.  Revelations in 2017 concerning third party and vendor ability to hack into installed equipment via a backdoor, written into the coding, exposing a national security as well as a crime risk, and failure to disclose the vulnerabilities in real time.[21] This allowed the Chinese government to spy using Dahua's cameras.[22]

8.  The acquisition of Lorex[23] which was announced on February 6, 2018, would have been a target for its main competitor, Hikvision, or for other competitors.  The Lorex acquisition was important because Dahua acquired the company and its technology/distribution channels (including over 100 products and $140 million in revenue), as well as its strong relationships with North American retailers, important because Dahua is on the US's blacklist.[24] Dahua also acquired important human capital in the acquisition, including its now current Vice President of Sales for the US subsidiary.[25]

9.  Dahua's position in the surveillance market is subordinate to Hikvision, which has a larger market share.[26] Hikvision's 2018 revenue was over $7 Billion[27], while Dahua's was approximately $3.5

---

[20] https://www.dahuatech.com/upload/2019/03/27/15536495602842uh2b1.pdf
[21] https://ipvm.com/reports/dahua-backdoor
[22] https://www.abc.net.au/news/2018-09-12/chinese-video-surveillance-network-used-by-australian-government/10212600
[23] https://ipvm.com/reports/dahua-lorex
[24] https://www.securityinfowatch.com/video-surveillance/article/12395991/flir-sells-lorex-smb-security-business-to-dahua
[25] https://us.dahuasecurity.com/?p=49937
[26] A984; https://www.cmbi.com/upload/202103/20210325336113.pdf
[27] https://www.csis.org/blogs/technology-policy-blog/hikvision-corporate-governance-and-risks-chinese-technology

Expert Report of Oded Shenkar
Dahua Technology v. Feng Zhang
Dated: May 24, 2021
Page: 10

Billion.[28] In fact, Dahua's performance is measured against its "gap" with Hikvision.[29] Hikvision is also a SOE, and the Chinese government is the largest shareholder.[30]

10. Fu's wife, Chen Ailing, is a member of Dahua's Board of Directors.[31]

The above information is material to the case and needs to be taken into account when considering the case events as they unfolded, as the information is highly relevant, for instance, in assessing the reasonable value of a non-compete, non-disparagement and confidentiality agreement on Zhang's part and perhaps more importantly, from Dahua's perspective. By way of introduction to my Statement of Opinion, which comes next, I reiterate that culture, important as it is, needs to be viewed and understood within the business context in which it is deployed. For instance, in the context of this case, set in the Chinese culture, values such as hierarchy and restraint are amplified (see Koch, Koch, Menon, and Shenkar, 2016, which shows the varying centrality of Chinese values and how it is affected by the business context in China-based joint ventures) and would explain a decision by Zhang not to actively 'voice' a concern about not getting paid as he should but rather wait for his boss "to do the right thing." Likewise, this decision should be viewed from the perspective of Fu, who knew that Zhang, as a Chief Strategy Officer and well as an officer of the US subsidiary, was privy to sensitive and highly valuable information of potential importance to competitors (e.g., a pending acquisition) or clients (e.g., probability of blacklisting by the US government, involvement in human rights violations in the Xinjiang province). After all, Fu is worth Billions, and flew to the US to do the deal with Zhang in person.

## VI Statement of Opinion

This section starts with a comprehensive review of Chinese cultural values that in my opinion are germane to the case before us, which will be subsequentially situated within the organizational, strategic, and business context in which they are embedded. Variations in region, sector, industry, ownership, and position, among other characteristics, will be taken into account, with a special emphasis on those typically missed or misinterpreted when using a US-centric lens (see Shenkar & von Glinow, 1994, and Shenkar, 2017, for a discussion of the limitations of using a Western lens to interpret Chinese phenomena). In forming and articulating this opinion, I

---

[28] https://www.dahuatech.com/upload/2019/03/27/15536495602842uh2b1.pdf
[29] Ibid.
[30] https://www.csis.org/blogs/technology-policy-blog/hikvision-corporate-governance-and-risks-chinese-technology
[31] https://www.forbes.com/profile/fu-liquan/?sh=42d47dea4f36

Expert Report of Oded Shenkar
Dahua Technology v. Feng Zhang
Dated:  May 24, 2021
Page:  11

rely on my decades of experience as a scholar and as an advisor to firms and governments in China, the US, and third countries, while laying out the scholarly evidence, as referenced.

Culture underlies much of what one observes inside and outside organizations. According to social information processing theory (SIP), employees find shared meaning and understanding of their workplace via social interaction and cues from other social actors (Weick 1995, a framework explaining how people enact their organizational environment). Societal culture shapes individuals' values and practices, as nested in societal mores (see Sagiv and Schwartz 2007, a theory derived and empirically tested cultural taxonomy). For instance, empirical research on organizational silence, highly relevant to the case at hand, shows that organizational practices and structures, impacted by societal culture, can lead to an organizational climate that encourages employees not to speak up about potential wrongdoing, among other concerns (Morrison and Milliken 2000, a conceptual framework predicting voicing concerns, based on prior empirical research).

Indeed, as already noted, cultural processes do not occur in a vacuum. As an example, the relevant context before us includes, among other variables, a highly competitive business environment, and intense competition in the video security sector, e.g., the head-to-head battle with the dominant player, Hikvision.  The two companies are the leading competitors in their field, are both based in China, and compete not only domestically but across multiple foreign markets, offering a similar range of products and services. Both enjoy the benefit of state support and preferential access to the Chinese market, the world's largest market for their wares. This bears, among other things, on the non-compete agreement Dahua sought from Zhang and its value. Think, for instance, of the potential damage to Dahua should Mr. Zhang decide to jump over to Hikvision at the time Dahua was negotiating the strategically vital acquisition of Lorex (2017-beginning of 2018).  Or, think of the harm of Mr. Zhang disparaging Dahua to would be customers or the US government as it relates to the backdoors written into the coding for Dahua's cameras.  The subsequent discussion of culturally derived 'voice behavior' would not be complete without an understanding of the aforementioned context. It is the combination of the cultural background with the business context in which this case is embedded that, in my professional opinion, explains why events have unfolded as they did, as well as what would reasonably be the value of the non-compete, non-disparagement and confidentiality agreement that Dahua sought from Mr. Zhang. The following observations vis-à-vis culture and its impact should be read with that in mind.

Expert Report of Oded Shenkar
Dahua Technology v. Feng Zhang
Dated: May 24, 2021
Page: 12

The first general observation I should make is that culture matters, and significantly so. Virtually every field of business, from strategy and finance to marketing and human resource management, is influenced by culture, and most studies show that the impact is substantial and, in many cases, decisive, that is, it is of critical importance even when other explanatory variables of interest are controlled for (see Ronen & Shenkar, 2017, for a review based on extensive literature search plus analysis of the largest assembled aggregate survey data, covering about half a million respondents in total). Among the areas impacted by culture are negotiations (e.g., Shenkar & Ronen, 1987b, an experience-based summary of Chinese negotiation strategy, tactics, and behavior, whether with outsiders or insiders (the latter applies to the negotiations between Mr. Zhang and Mr. Fu and his proxies) and various aspects of human resource management and organization behavior, e.g., leadership and motivation, all of which are germane to the case at hand.

The second observation is that culture has multiple layers --national, regional, industrial, corporate, sectorial, and occupational, among others. Among those, evidence shows that national culture appears to have the strongest influence on business, whereas other layers play a secondary role (See Ronen & Shenkar, 2017, for a review, see earlier details about the research). Variations in corporate culture are nontrivial but should be considered within the context of national culture, as the two are closely intertwined (e.g., Weber, Shenkar & Raveh, 1996, an empirical study of domestic versus cross-border mergers and acquisitions, using measures and data for both national and corporate cultures). For Dahua, the overwhelming cultural impact comes from it being a Chinese company, founded, headquartered, operated and controlled from China, with typically limited autonomy granted to overseas subsidiaries. As Zhang's 2018 severance agreement shows, Fu is the "Sole Director" of the US subsidiary.

As far as regional variations are concerned, Mr. Zhang hails from Shanxi, where traditional values are typically more pronounced (e.g., Goodman, 2002, a historical description of the formation of provincial identity in this Northern Chinese province). In terms of sectorial culture, Dahua is partially state owned, and the state has recently increased its ownership stake, implying a desire for closer oversight. In China, firms with an element of state ownership tend to be effectively controlled by the state even if the state nominally owns a minority of the outstanding shares. This is especially true under two conditions, both present here: First, when the State stake is held by central rather than local authorities, and, second, when the business line is considered relevant to national security, which is broadly defined in China to include internal security. Fu's resignation from the CEO position in

Expert Report of Oded Shenkar
Dahua Technology v. Feng Zhang
Dated: May 24, 2021
Page: 13

Spring 2017, when he was replaced by Ke Li was made CEO[32], presumably for "personal reasons" was likely the result of a government decision since it was not preceded, as is common, by an official press or general announcement. This (and the 2021 increase in the state's stake) suggest a desire to take greater control of the Company, making it almost akin to a State-Owned Enterprise (SOE). SOEs tend to be positioned within the milieu of traditional Chinese culture, that is, they are typically run according to the cultural norms and traditions championed by the state, which has, in recent years endorsed Confucian culture, in addition to the official ideology and political decrees of the Chinese Communist Party (CCP). The organizational implications include a high degree of centralization (see discussion of # hierarchy below), which also denotes that overseas subsidiaries are not run as autonomous entities and are subject to the cultural and institutional norms of the parent firm.

The third observation I should make is that the national cultures of the United States and China are not only different, as evidenced, for instance, by their disparate culture cluster affiliation at the highest cutoff level (see the clustering map and related information in Ronen & Shenkar, 2017, based on an aggregate of roughly half a million individuals), but in many ways are diametrically opposed (e.g., Oyserman, Coon & Kemmelmeier, 2002, a meta-analysis of studies exploring individualism and collectivism), to the point that the two cultures are often chosen to illustrate the magnitude and power of cross-cultural differences (e.g., Ma, Huang & Shenkar, 2011, an empirical comparison of entrepreneurs in the US and Taiwan). Given the ancestry of the individuals involved and some of the actions taken, the underlying culture in this case is unequivocally Chinese. Evidence shows limited cultural transformation even among second and third generation Chinese immigrants (e.g., Rosenthal & Feldman, 1990, an empirical comparative study of Chinese immigrants in the US versus Australia); let alone someone like Mr. Zhang who was socialized in China during his formative years and well beyond the generally accepted socialization threshold (up to 14 years of age), including his undergraduate university education.

The fourth observation is that globalization notwithstanding, evidence shows little if any change in cultural patterns over time. In other words, the argument that cultures have been converging around some universal values, tempting as it may be, is simply incorrect. For example, an analysis of the largest and most diversified aggregate of cultural surveys available to date, has shown virtually no change in cultural clustering over a span of over two decades (Ronen & Shenkar, 1985; 2017, a comparison of cultural maps at two points in time). Other evidence

---

[32] https://ipvm.com/reports/dahua-fu-out

Expert Report of Oded Shenkar
Dahua Technology v. Feng Zhang
Dated: May 24, 2021
Page: 14

from such fields as psychology and anthropology also show that core cultural traits tend to survive over long periods of time.

### Relevant Chinese Values

I should reiterate that I am not aiming at providing an exhaustive review of all Chinese values here. Many related issues, such as the impact of the centrality of certain values in interactions between foreign and Chinese firms (see Koch, Koch, Menon, and Shenkar, 2016, described earlier), while indirectly relevant to the case at hand, are not discussed here. The focus is on work related values (Ronen & Shenkar, 2017, described earlier), in particular Chinese interpersonal norms (see Shenkar & Ronen, 1987b, described earlier in relation to negotiations) as opposed to the broader cultural lineup (e.g., Shenkar & Ronen, 1987a, a statistical rank analysis of work-related values across Mainland China, Hong Kong, Taiwan, and Singapore), since those directly relate to the interaction between individual actors, in this case, Fu and Zhang. Still, as a general approach, I take a comprehensive view of cultural affinities, which takes into account individual profiles (see Cooper, Stanley, Stevens, Shenkar & Kausch, 2020, an experimental analysis of cultural profiles). This means that cultural values should not be treated in isolation but rather as an integrated whole, though the approach does not negate the use of collectively applicable profiles of such values as guideposts. For example, relevant for our purposes is the combination of face and conflict avoidance (Peng & Tjosvold, 2011, a study comparing the conflict avoidance strategies of Chinese employees when facing Western versus Chinese managers; a similar study was done by me in a large Hong Kong based company, which cannot be disclosed). The role of cultural beliefs and values (Leung, 1995, covering Chinese psychological, social, and environmental beliefs) as well as processed of causal attribution are in and of itself culturally variable (e.g., Crittenden, 1995, summarizing prior research on attributional processes among the Chinese), which I take into account when it comes to analyzing how the actors have enacted the context of the events at hand, for instance, the extent to which they believe they have had control over it (this is professionally called 'locus of control').

To start with a bird's eye, comparative view: China is member of the Confucian cultural cluster as analyzed and reported in Ronen & Shenkar's (2017, described earlier) clustering map. Among the attitudes and behaviors associated with this cultural cluster are, for instance, an elevated reliance on vertical sources of guidance (see # hierarchy below), relatively high deference to higher status individuals, and reliance on the group as the focal actor (see # collectivism below). Cultural variations across Chinese societies are noted, though they have been shown to

Expert Report of Oded Shenkar
Dahua Technology v. Feng Zhang
Dated: May 24, 2021
Page: 15

be secondary to variations between those societies as a group and other societal cultures (Ronen & Shenkar, 1987a, described earlier). The focus here is on the People's Republic of China, based on the relevance in this case, inclusive of the applicable institutional and political context. A brief China-specific list of cultural values appears below.

*Hierarchy*: Hierarchy is one of the most important tenets of Confucianism, and studies (e.g., Shenkar and Ronen, 1987, described earlier) show that it has been upheld in all Chinese societies, including Mainland China during the heydays of Maoist ideology, which was nominally hostile to this value and its application, which demonstrates how deep seated this value is in the national culture because it has survived as a core value. Indeed, modern data, such as that in the GLOBE survey, shows the value of power distance, a synonym term for hierarchy, not only to be high relatively to most other cultures, but also as having among the lowest discrepancies between "as is" and "should be" readings, implying high tolerance for vertical social relations (Fu, Yu & Yang, 2008, a dedicated China section of the large and well-known GLOBE empirical, cross-cultural project). In China, hierarchy is associated with paternalistic, directive leadership, with strong deference to senior office holders and expectations of loyalty. Questioning the senior most officers constitute an inappropriate and risky behavior. Not surprisingly, acts such as whistleblowing, sensitive as they are in any organizational context, are way more problematic under hierarchical cultures (Loyens, 2013, whistleblowing treated from the perspective of Grid-Group cultural theory) not only in and of the risks entailed in the disclosure but also by way of undermining a set authority structure. Further to this point, when Zhang did negotiate the severance amount, he did not do so directly with Fu. Rather, he spoke with the company's human resources executive who Fu brought to the US for the negotiation about how he could make millions publishing on his experiences. This demonstrates Zhang's conformance with the hierarchy at play. Such use of a third party is very common in Chinese culture.

*Harmony and Restraint*: Harmony is a foundational feature of Confucianism, and appears repeatedly in the Analects and other traditional canon texts. Studies show that this value has been preserved not only in modern China but also among overseas Chinese, for example, among second and third generation Chinese kindergarten students. Conflict avoidance is a corollary, and there is evidence of such behavior persisting. Importantly for the case before us, aggression, or even the hint thereof, towards authority figures is especially frowned upon (Ho, 1985, summary of Chinese socialization patterns). Delaying, that is postponing of taking an immediate action to raise and discuss the conflict, has been empirically found to be a dominant strategy for Chinese employees when dealing with Chinese bosses but not when dealing with Western supervisors (Peng & Tjosvold, 2011, described

Expert Report of Oded Shenkar
Dahua Technology v. Feng Zhang
Dated: May 24, 2021
Page: 16

earlier). This would predict Mr. Zhang's hesitancy to call on his boss and his preference to "wait it out" while expecting the boss to eventually "do the right thing" and pay Zhang what he was owed, a Confucian edict in its own right. Indeed, the ideal leader in Confucianism is expected to act without an explicit decree from above or a verbal complain from below. Violating this understanding would have caused irreparable damage to Zhang's all important *guanxi*, or relationship network, causing irreparable damage not only to his own prospects but also to those of the company and its leader. The factual record in this case shows that Zhang consistently exercised the "wait it out" for Fu and the company to "do the right thing" for all of 2016, half of 2017, and under his severance agreement payment period from August 2017 through January 2018. Zhang's actions in this regard were consistent with the cultural expectations at play.

*Collectivism:* Collectivism infers that the group is the focal actor (Ronen & Shenkar, 2017, described earlier), and that its welfare is generally more important as that of the individual who will benefit by way of his/her group membership. As a result, instrumental goals do not receive priority over the preservation of harmony (another Confucian value) in the group (e.g., Hofstede, 1980, data based cross-national variation of cultural values based on a large IBM dataset). Relatedly, China is also characterized by high embeddedness; in such cultures there is an expectation that "restraining actions or inclinations that might disrupt in-group solidarity or the traditional order" be avoided (Sagiv and Schwartz, 2007: 179, described earlier). Zhang's actions, or lack of, should be viewed from this perspective rather than from the individualistic cultural orientation common in the US, where an individual is expected to immediately (see Time Orientation, below) react to anything that might seem important, especially contrary to his interest.

*Time Orientation:* As Michael Bond's research indicates (Chinese Culture Connection, 1987, the only cultural dimension developed on the basis of indigenous Chinese cultural tradition), China is very high on Long-Term Orientation (LTO; formerly labelled "Confucian Dynamism). All the top ranked societies on that scale are Confucian-oriented, with Mainland China being the highest of all countries surveyed. Recent research confirms the importance of this dimension (e.g., Lin & Ho, 2009, a comparison of different Chinese societies). Cultures that are high on LTO combine a strong sense of tradition and desire to preserve convention with a readiness to plan for the future and delay immediate gratification. Merkin (2004, linking Long Term Orientation with face behavior, especially relevant here) notes that members of high LTO cultures are more likely to use harmony and cooperation in their strategic facework. Together with the strong hierarchy and collectivism characteristic of such

Expert Report of Oded Shenkar
Dahua Technology v. Feng Zhang
Dated:  May 24, 2021
Page:  17

culture, one would expect a behavior where one awaits the boss to act rather than aggressively push for an immediate resolution of a personal or an organizational grievance, risking group harmony.

*Face:*  Face is a multifaceted complex construct that is too often described in a simplistic fashion. Preserving face requires an all-out effort of impression management whose purpose is to minimize embarrassment to oneself as well as to significant, transactional counterparts. According to Bond and Hwang (1985, a summary of Chinese face behavior), preserving the face of those high on power and status can help obtaining help from an allocator of resources.  This too would explain why a complaint was not made, as it would make Fu, and, by extension, Zhang, look bad.  It would also explain why Fu sought to convince Zhang to sign up for confidentiality and non-disparagement, as whistleblowing or other adversarial activity from Zhang would hurt Dahua and result in Fu losing face with the Chinese government at a time when his own guanxi with the government was apparently under stress.

*Voice:*  Organizational silence research indicates that employees go through a careful, deliberate decision making before speaking up, a process strongly impacted by psychological and situational factors (Ashford, Sutcliffe, & Christianson, 2009, focused on face behavior); Edwards and Greenberg 2009; Near, Dworkin & Miceli, 1993, focused on voice versus silence in wrongful situations) that vary across cultures). Also related to the values of restrain and face, and contrary to most Western cultures, silence is often used by Chinese as a strategy in negotiations with others (e.g., Shenkar & Ronen, 1987b, described earlier), while speaking up comes with strings. Gao, Toomey & Gudykunst (1995:285, a taxonomy of Chinese communication processes) write that "In Chinese culture, there are conditions associated with speaking, and not everyone is entitled to speak. People only voice their opinions when they are recognized, and recognition may be derived from expertise on a subject due to experience, education, or a power position. A spoken 'voice' is equated with seniority, authority, experience, knowledge, and expertise."

It is well established that Chinese are hesitant to speak up, especially when interacting with a supervisor (e.g., Wang, Wu, Liu, Hao & Wu, 2019). In Chinese society, with its emphasis on hierarchy and harmony and its appreciation of restraint, speaking up, especially on a sensitive matter may undermine the credibility of the leader and upset the cherished status quo (e.g., Liang, Farh & Farh, 2012, an empirical study of voice behavior in a Chinese context). In the case before us, Mr. Fu was the senior most leader of the organization as well as Mr.

Expert Report of Oded Shenkar
Dahua Technology v. Feng Zhang
Dated: May 24, 2021
Page: 18

Zhang's immediate supervisor, creating two situational vectors constraining Zhang's voice behavior. Smith and Wang (1995, a comparison of leadership styles) compare Leader Event Management in the US, the UK and China, and find that "Chinese managers were much more likely to rely upon their superiors in handling events than were Western managers" (1995:331). Finally, the above observations come on top of broad research in psychology and organizational behavior that finds that "deep seated employee attitudes about authority in hierarchical organizations" are a key determinant of voice behavior (e.g., Detert & Trevino, 2010:249, linking voice behavior to authority relations). Thus, Chinese culture further reinforces and amplifies the connection between authority and voice that can be found in societies at large.  This is, again, consistent with the pattern where it was Mr. Fu who was expected to initiate the discourse and action and where the more junior Zhang was at risk of inappropriate behavior if he were to imply a lack of action or otherwise raise doubt about Fu's behavior.

### *Further Case Context*

Additional case details reaffirm that Dahua is run "the Chinese way" rather than "the American way". For example, in China, and often in overseas Chinese communities, large portions of one's compensation are handed prior to the Chinese New Year (typically in early February on the Western calendar), which is the most important festival in the country. Similarly, large cash payments (so called "red envelopes"), of the sort Fu gave to Zhang, are common in China but virtually unheard of in the United States, where they would immediately arouse suspicion of foul play, be it tax avoidance, money laundering of illicit funds, or other activities with a criminal intent or at least containing an element of non-compliance with law and regulation. Such payments would also come under the scrutiny of the Foreign Corrupt Practices Act (FCPA), to which US-based foreign subsidiaries are subjected as well. Making such a payment to a US based employee, even if made in China, would suggest, first, yet again, that Dahua was managed "the Chinese way" and, second, that it may have had something to hide; that it wanted to carry special favor with Zhang either by way of rewarding him for special services or by creating a non-financial debt (see Shenkar & Ronen, 1987b, described earlier) that would compel him to render unusual favors or offer compliant behavior for the company and/or for Fu.

It follows from that and from the prior observations that the norms and expectations by a Chinese origin employee and a Chinese firm are embedded in Chinese culture, especially given that both the company and the employee are Chinese in origin and have been the subject of Chinese cultural socialization. It is common for Chinese companies abroad to seek executives with a Chinese ancestry on the assumption that communications between the firm and

the individual will be easier, and that the executive may serve as a bridge of sort between the company and the staff of the overseas subsidiary. Furthermore, in the case before us, the employee was employed in a dual role, one of which pertains to the US subsidiary, while the other, his strategic role, applied to the company as a whole. It is reasonable to expect under those circumstances that Chinese culture governed most if not all transactions between the parties. The company wide role also demonstrates that Zhang had intimate knowledge of the Company's operations the world over, including of its competitive position, strategy, and pending transactions (e.g., the Lorex acquisition), pending government actions (e.g., blacklisting by the US government), and potential sales transgressions (e.g., alleged use of backdoors written into code to help Chinese government in its surveillance/spying efforts). All that would make Zhang's knowledge of very high value to competitors such as Hikvision, and, potentially, to various authorities.

As an example of the timeline, the listing of Dahua on the roster of the National Defense Authorization Act (NDAA), preventing federal agencies, organizations supported with federal dollars, and those that are part of critical infrastructure, was made on August 13, 2018, and was scheduled to take effect a year later. The listing of the Company under the Final Rule of the Export Administration Regulations (EAR) was announced October 9, 2019. In both cases, the final ruling and announcement are the culmination of an elaborate process. The EAR, for instance, allows, among other provisions, for a company to apply for a Hardship Relief, while the NDAA allows the seeking of a waiver. It is thus highly likely that the information on the incoming sanctions was known internally within Dahua at the time the events described in this case unfolded.

Overall, while it is indisputable that cultural influences are highly material, they need to be considered in light of the institutional and political context in which this case is embedded. Thus, when one talks about "voice" in a hierarchical Chinese setting (or any setting for this matter), it is imperative to consider the repercussions of a key subordinate speaking up and the potential value and repercussion of disseminating the given information. In the case before us, the question of whether a $10 million severance, inclusive of non-compete, non-disparagement and confidentiality clauses (in addition to releases to stock), is reasonable and even expected at that order of magnitude, must be considered not only from the aforementioned cultural perspective, which is well documented empirically (e.g., Cheng, X., Karim, K.E., & Lin, 2015) but, concomitantly, within the context of the political system and the focal firm tightly embedded in it by virtue of ownership and industry. It is well established that whistleblowing in China is rare especially when it comes to nationally sensitive matters, which is acknowledged

Expert Report of Oded Shenkar
Dahua Technology v. Feng Zhang
Dated: May 24, 2021
Page: 20

even by those who believe that some change is visible (e.g., Zhang, J., Chiu, R. & Wei, 2008, covering how whistleblowing decisions are made in a Chinese context). The fate of those in China who called attention to the emergence of Covid-19 is a good example. Here, we are dealing with a firm that is not only partially state owned and engaged in activities linked to national security, but one where certain disclosure repercussions, in particular those regarding human rights, are very much a concern of the central government. What we have is a senior executive overseeing the strategy of a company operating in a highly competitive market that is under international scrutiny, as well as on the verge of major transactions, such as the Lorex acquisition, which would be of great interest to competitors as well as to the national authorities that could have killed the contemplated deal prior to its closing and announcement.

I find Zhang's argument that he counted on the Chairman to 'do the right thing' in respect to the Company's pledged obligations towards him eminently credible. Chinese leadership style is paternalistic, a trait that tends to be especially pronounced in Chinese SOEs (e.g., Zhu, Zhang & Shen, 2012, covering change and continuity in Chinese human resource management) but is also prominent in entrepreneurial companies controlled by an owner founder (e.g., Wang, Tee & Ahmed, 2012, an exploratory case study of Chinese leadership as rooted in Confucianism), both of which clearly apply here. Subordinates in China are not expected to argue for their rights too aggressively, as that failure to show restraint would result in losing face. In Chinese culture, the senior most leader has an outsized role, which is especially true when the boss is also the founder, as is the case for Mr. Fu and Dahua, and when the product has national security aspects, as is also the case here. Confrontation and conflicts are to be avoided (e.g., Friedman, Chi & Liu, 2006, an expectancy model comparing China and the US tested via a scenario analysis), and the more authoritarian the boss' style, the less 'voice behavior' is likely to happen (Li & Sun, 2015, Chinese leadership and its relation to voice behavior). While all chief executives have vast authority, in China that person tends to be involved in the most minute details. It is therefore doubtful to me that Mr. Fu did not review the severance agreement and know of its contents before he offered it to Zhang. Fu was prepared for his deposition and even brought a version of Zhang's 2015 employment agreement translated from English into Chinese with him.[33] He likely would have had the severance agreement translated as well so he could approve it before signing so he could control the transaction down to the details. It is also not feasible that a company chairman who is worth Billions would make a special trip to the US with a team in tow to discuss a six-figure settlement, or that he would have a subordinate pick him up from the airport so he could have a discussion right

---

[33] A206

Expert Report of Oded Shenkar
Dahua Technology v. Feng Zhang
Dated:  May 24, 2021
Page:  21

then and there (in the car), unless the matter was of critical importance as well as confidential (so that not even a chauffeur would be privy to the conversation).

## Conclusion

To sum up, it is my professional opinion that, when one understands, evaluates and accounts for the Chinese cultural dynamics at play coupled with the facts presented:

1. A payment to Zhang in the order of magnitude of $10 million for a severance that included confidentiality, non-disparagement, non-competition and release clauses (including Zhang's stock) would be expected as among other things the perceived damage to Dahua for Zhang going to a competitor or revealing confidential information was critical; and

2. When confronted in August 2017 with failure to make the proper severance payments (as with his previous salary underpayments), Zhang would not be expected to complain about such failures for many months.

3. Fu's insistence of a confidential, private meeting between him and Zhang, clearly suggests the severance negotiation with Zhang was of high importance and warranted his direct personal involvement.  While "to err is human", I find it highly unlikely that an error of the magnitude claimed by Dahua in this case could have slipped through a centralized organization where Fu, the senior most person, was advised by counsel and personally involved in the process.

Respectfully submitted.

_Oded Shenkar_

_____

Oded Shenkar

Expert Report of Oded Shenkar
Dahua Technology v. Feng Zhang
Dated:  May 24, 2021
Page:  22

## References

Ashford, S. J., Sutcliffe, K. M., & Christianson, M. K. (2009). Speaking up and speaking out: The leadership dynamics of voice in organizations. Greenberg J, Edwards M, eds. *Voice and silence in organizations* (Emerald Group Publishing, Bingley, UK), 175–201.

Bond, M. (Ed.), *The psychology of the Chinese people*, Oxford University Press, 1986.

Bond, M. (Ed.), *The handbook of Chinese psychology*. Oxford University Press, 1995.

Bond, M.H. & Hwang, K.K. The social psychology of Chinese people. In Bond, M. (Ed.), *The psychology of the Chinese people*, Oxford University Press, 1986, 213-266.

Cheng, X., Karim, K.E., & Lin, K.J. A cross-cultural comparison of whistleblowing perceptions, *Interntional Journal of Management and Decision Making,* 14, 1, 2015, 15-32.

Chinese Culture Connection, Chinese values and the search of culture free dimensions, *Journal of Cross-Cultural Psychology,* 18, 2, 1987, 143-164.

Cooper, Joseph T., Stanley, Laura J., Stevens, Charles E., Shenkar, Oded, and Kausch, Caterina, Switching Analytical Mindsets: A Person-Centered Approach to the Analysis of Cultural Values**,** *International Journal of Cross-Cultural Management,* 20, 2, 2020, 223-247

Crittenden, K.S., Causal attribution processes among the Chinese. In Bond, M. (Ed.), *The handbook of Chinese psychology*. Oxford University Press, 1995, 263-279.

Detert, J.R. & Trevino, L.K. Speaking up to higher ups: How supervisors and skip-level leaders influence employee voice. *Organization Science,* 21, 1, 2010, 249-270.

Edwards, M.S., & Greenberg, J. (2009). Sounding off on voice and silence. In Greenberg J, Edwards M, (eds.), *Voice and silence in organizations* (Emerald Group Publishing, Bingley, UK), 275–291.

Friedman, R., Chi, S.C. & Liu, A. An expectancy model of Chinese-American differences in conflict avoiding. *Journal of International Business Studies,* 37, 2006, 76-91.

Fu, P.P., Wu, R.X. & Yang, Y.K. Chinese culture and leadership. In Chhokar, J.S., Brodbeck, F.C. & House, R.J., eds.), *Culture and leadership across the world,* NY: Taylor & Francis, 2008, 877-908.

Gao, G., Ting-Toomey, S., & Gudykunst, W.B., Chinese communication processes. In Bond, M. (Ed.), *The handbook of Chinese psychology*. Oxford University Press, 1995, 280-293.

Goodman, D.S.G., Structuring local identity: Nation, province and county in Shanxi during the 1990s. *The China Quarterly,* 2002, 837-1139.

Expert Report of Oded Shenkar
Dahua Technology v. Feng Zhang
Dated: May 24, 2021
Page: 23

Ho, D.Y.F., Chinese patterns of socialization: A critical review. In Bond, M. (Ed.), *The psychology of the Chinese people*, Oxford University Press, 1986, 1-37.

Hofstede, G. *Culture's consequences.* CA: Sage, 1980 (see also 2001).

Koch, Pamela, Koch, Bradley, Menon, Tanya, and Shenkar, Oded, Cultural Friction in Leadership Beliefs and Foreign Invested Enterprise Survival, *Journal of International Business Studies***,** 47, 4, 2016, 453-470

Leung, K. The role of beliefs in Chinese culture. In Bond, M. (Ed.), *The handbook of Chinese psychology.* Oxford University Press, 1995.

Li, Y. & Sun, J.M. Traditional Chinese leadership and employee voice behavior: A cross-level examination. *The Leadership Quarterly,* 26, 2, 2015, 172-189.

Liang, J., Farh, C.I.,C. & Farh, J.L., Psychological antecedents of promotive and prohibitive voice: A tw0-wav examination. *Academy of Management Journal,* 55, 2012, 71-92.

Lin, L.H. & Ho, Y.L., Confucian dynamism, culture and ethical changes in Chinese societies – a comparative study of China, Taiwan, and Hong Kong. *The International Journal of Human Resource Management,* 20, 11, 2402-2417.

Loyens, K.J. (2013). Towards a custom-made whistleblowing policy. Using grid-group cultural theory to match policy measures to different styles of peer reporting. *Journal of Business Ethics*, 114(2), 239–249.

Ma, R., Huang, Y.C., and Shenkar, O., Social networks and opportunity recognition: A cultural comparison between Taiwan and the United States, *Strategic Management Journal,* 32 (11), 2011, 1183-1205.

Merkin, R.S., Cultural long-term orientation and facework strategies, *Atlantic Journal of Communication,* 12, 3, 2004, 163-176

Morrison, E. W., & Milliken, F. J. (2000). Organizational silence: A barrier to change and development in a pluralistic world. *Academy of Management Review*, 25(4), 706–725.

Near, J. P., Dworkin, T. M., & Miceli, M. P. (1993). Explaining the whistle-blowing process: Suggestions from power theory and justice theory. *Organization Science*, 4(3), 393–411.

Oyserman, D., Coon, H.M., & Kemmelmeier, M., Rethinking individualism and collectivism: evaluation of theoretical assumptions and meta-analyses, *Psychological Bulletin,* 128, 2002, 3-72.

Peng, A.C. & Tjosvold, D., Social face concerns and conflict avoidance of Chinese employees with their Western or Chinese managers, *Human Relations,* 64, 8, 2011, 1031-1050.

Ronen, S., and Shenkar, O. Clustering countries on cultural dimensions: A review and a synthesis. *Academy of Management Review*, 1985

Expert Report of Oded Shenkar
Dahua Technology v. Feng Zhang
Dated: May 24, 2021
Page: 24

Ronen, S., and Shenkar, O., *Navigating global business: A cultural compass*. Cambridge University Press, 2017.

Rosenthal, D.A. & Feldman, S., The acculturation of Chinese immigrants: Perceived effects on family functioning of length of residence in two cultural contexts. *The Journal of Genetic Psychology,* 151, 4, 1990, 495-514.

Sagiv, L., & Schwartz, S. H. Cultural values in organizations: Insights for Europe. *European Journal of International Management*, 1(3), 2007, 176–190.

Shenkar, O., and Ronen, S.  The Structure and Importance of Work Goals among managers in the People's Republic of China.  *Academy of Management Journal*, 30 (3), 1987a, 564-576.

Shenkar, O., and Ronen, S.  The Cultural Context of Negotiation:  The Implications of Chinese Interpersonal Norms.  *The Journal of Applied Behavioral Science*, 23 (2), 1987b, 263-275.

Shenkar, O., and von Glinow, M. A.  Paradoxes of Organizational Theory and Research: Using the Case of China to Illustrate National Contingency.  *Management Science*, Special Issue on the Universality of Management Science, 40 (2), 1994, 56-71. (ranked among most cited articles on Chinese management in Tsui & Lau, 2002).

Shenkar, O., Management with Chinese characteristics, *Quarterly Journal of Management*, 1, 1, 2017, 1-11 (in Chinese).

Smith, P. B. & Wang, Z.M., Chinese leadership and organizational structures. In Bond, M. (Ed.), *The handbook of Chinese psychology*. Oxford University Press, 1995, 323-337.

Wang, C.L., Tee, D.D. & Ahmed, P.K., entrepreneurial leadership and context in Chinese firms: a tale of two Chinese private enterprises, *Asia Pacific Business Review*, 18, 4, 2012, 505-530.

Wang, H., Wu, W., Liu, Y. Hao, S. & Wu, S. In what ways do Chinese employees speak up? An exchange approach to supervisor-subordinate *guanxi* and voice behavior, *The International Journal of Human Resource Management*, 30, 3, 2019, 479-501

Weber, Yaakov, Shenkar, Oded, and Raveh, Adi. National versus corporate cultural fit in mergers and acquisitions:  An exploratory study. *Management Science*, 42 (8), 1996, 1215-1227.

Weick, K. E. *Sensemaking in organizations*, Sage, 1995.

Zhang, J., Chiu, R. & Wei, L. Decision making process of internal whistleblowing in China: Empirical evidence and implications. *Journal of Business Ethics*, 88, 2008, 25-41.

Zhu, C.J., Zhang, M, and Shen, J. Paternalistic and transactional HRM: The nature and transformation of HRM in contemporary China, *The International Journal of Human Resource Management*, 23, 19, 3964-3982.