**EXHIBIT E**



**Exhibit 110**



# Report of Kent D. Kedl

Expert witness opinion

Strictly confidential

28 May 2021

CLIENT CONFIDENTIAL WORK PRODUCT

Control Risks Group (Shanghai) Limited | Suite 701, Henderson 688 |
No. 688 Nanjing Road West Shanghai 200041 | China
+86 21 6010 9700    shanghai@controlrisks.com



**Strictly confidential**

The information contained herein does not constitute a guarantee or warranty by Control Risks Group Holdings Limited, its subsidiaries, branches and/or affiliates ("Control Risks") of future performance nor an assurance against risk. This report is based on information provided by the client and other information available at the time of writing. It has been prepared following consultation with and on the basis of instructions received from the client and reflects the priorities and knowledge of the client as communicated to Control Risks. Accordingly, the issues covered by this report and the emphasis placed on them may not necessarily address all the issues of concern in relation to its subject matter. No obligation is undertaken by Control Risks to provide the client with further information, to update this information or any other information for events or changes of circumstances which take place after the date hereof or to correct any information contained herein or any omission therefrom. Control Risks' work and findings shall not in any way constitute recommendations or advice regarding the client's ultimate commercial decision, which shall, in all respects, remain the client's own.

This report is for the benefit of the client only (including its directors, officers and employees) and may not be disclosed to any third parties without the prior written consent of Control Risks.

Copyright © Control Risks. All rights reserved. This document cannot be reproduced without the express written permission of Control Risks. Any reproduction without authorisation shall be considered an infringement of Control Risks' copyright.



**Strictly confidential**

# Background

I have been working in the People's Republic of China since 1988 and have been living here most of the time since then. I have significant experience with human resource matters, particularly those that include people from different languages and cultures. At present, I am the head of Control Risks for Greater China and North Asia and am based in Shanghai.

We are a risk management consulting firm and one of our areas of speciality is company investigations and operational restructuring, exiting members of a senior management team and helping the company continue to seamlessly run their business operations. At a conservative estimate, in the past five years, I have been involved in over 40 situations where a senior business leader is removed, and a termination settlement has been reached. All of these cases have been with Chinese employees working for a company in China.

The reasons for termination run along a spectrum from "for cause" (ethical and business practice concerns) to "not for cause" (the company is taking a different strategic direction and needs to refresh their China leadership). Often, we are called in when a company's management has suspicions that a senior manager is participating in unethical behavior (fraud, corruption, conflict-of-interest, etc.) and they want us to investigate the allegations. Our methodologies include public record research, gathering intelligence through discreet market enquiries, financial forensics, technology forensics and data analytics. Our job at this stage is to find evidence of wrongdoing and build a case to act. Similarly, though not as often, we are called in to help a company make a leadership change because they are changing their strategy and they feel that their current leadership is not able to lead that change. A key step in our support of clients is to help them develop their strategy to exit employees. Employees who have been with a company for a long time will usually have open-ended employment agreements and, as Chinese labor laws greatly favor the employee, it is nearly impossible to dismiss an employee for any reason at all . Therefore, the company needs to take matters into their own hands to devise and execute a strategy to remove the employee without causing disruption to the business. Employees in China know the broad outlines of the labor law and, if they want to stay in their job, will often threaten to blow the whistle to police or regulators with vague allegations of company wrongdoing. Many of the high-profile cases of foreign companies being investigated by Chinese regulatory authorities started from allegations from an employee who felt that they were not being treated fairly.

Very often, we are asked to directly negotiate the exit agreement with the employee rather than have company employees do the negotiations. A third party can remove much of the emotion from the negotiations, focusing only on the task at hand: coming to an agreement on the terms of dismissal while protecting business continuity and the safety and security of people and assets. We have often played this role for foreign companies in China over the last 18 months when, due to COVID restrictions, it has been impossible for headquarter management to come to China to deal with these issues themselves.

A recent example of this is the following: a private US firm with operations in China had a Chinese GM who had been with the company for nearly 20 years. A new global CEO felt that the company was not growing fast enough in China and wanted to replace the GM. Senior management reached out to us to assist them in planning and executing an exit for the GM. I designed the approach and led the project.



**Strictly confidential**

We developed a plan to terminate to terminate the GM with the possibility of additional dismissals in the days following. We assessed the risk of various scenarios and planned mitigations and responses for each (the GM was very well known in their sector and, if upset, could cause the company reputational damage with customers and regulators). A detailed communications plan was created to identify key internal and external stakeholders and the messages, channels, and timing of each communication. We also arranged with the client's IT provider to monitor email accounts and cut off systems access at the proper time.

We designed a negotiation strategy that started with the statutory requirement to compensate a dismissed employee – a formula that considers the number of years of employment and their average salary – with various increases in compensation tied to the employee agreeing to our terms (signing a termination agreement, commitment to non-disclosure and non-disparagement clauses, returning company property, etc.) and a final BATNA ("best alternative to a negotiated agreement") amount. We will often role-play various scenarios if we know the employee to be dismissed is particularly aggressive, which we did in this case.

On the day of termination, we coordinated an off-site meeting with the GM where final settlements and termination agreements were reached. The GM was very surprised and quite upset that he was being terminated; however, after many hours of discussion and negotiations, he agreed to each of our terms and to a settlement far under the BATNA.

I reviewed the following documents to prepare this report:

- Depositions and associated exhibits from:
    - Feng Zhang
    - Liquan Fu
    - Xiaping Hu
    - Cathryn Le Regulski
    - Haiyan Yue
- Dockets 1, 37, 45, 46, 47, 60-66
- The Consulting Agreement
- The Offer of Employment
- The Severance Agreement

# Opinion

1. Zhang Fang (Mr. Zhang) claims, in part, that he did not confront Dahua's Chairman, Fu Liquan (Mr. Fu) about not following through on signed agreements because the Chinese "cultural" approach was non-confrontative, particularly when it comes to senior leaders (Zhang deposition, pgs. 74, 156, 210). The notion that senior executives are ordinarily not confrontational is a significant overstatement and does not reflect Chinese business cultural norms.
    - It is normal and consistent with Chinese business culture that employees will confront their bosses with disagreements, but China has developed a broader range of channels for this confrontation and sometimes indirect channels are used. For example, if an employee does not want to confront their boss, they will often go through subordinates. Every senior business leader has trusted lieutenants



**Strictly confidential**

through whom they will often communicate with employees, particularly when potential conflict may be involved. In fact, I have seen complete employment exit agreements negotiated through intermediaries (and, in fact, my firm often acts as that channel).

- Even so, in my experience, employees will often confront their bosses directly, particularly in cases such as this one when the employee is being removed from their position, against their wishes. I have seen many cases during a employment dismissal discussion where a Chinese employee will lash out at their boss, angry at being informed that they are being dismissed. We have even had cases where an employee was violent against a supervisor, though this is rarer in China.
- Still, contrary to his claim that he took a non-confrontative approach, Mr. Zhang did, in fact, directly confront Mr. Fu during their face-to-face contract negotiation in August 2017. This is completely consistent with Chinese norms, in my experience:
    - what would become of his outstanding shares if he moved to an advisor role (120)
    - when told by Mr. Fu that he needed to sign a new agreement, Mr. Zhang replied, "it depends on what is in it." (120-1)
    - to remove the "at will" employment stipulation (160)
    - said, "I reject the contract. I told them I didn't like it, both Ms. Yue sitting there, Mr. Fu standing … I just walk out the door" (160)

2. Christine Le Regulski said that the consulting role was, in effect, the compensation for the settlement agreement and the release of claims (Le Regulski deposition, 58). Mr. Fu said that this was effectively compensation because "there wasn't much work done." (Fu, 34)
    - This is a very common tactic when settling an employment dispute in China and I have personally used it dozens of times as compensation for the employee agreeing to a non-compete/non-disparage clause.

3. If Mr. Zhang did, indeed, object to the $680K total payment and there was to be "additional compensation to entice him to release all claims against Dahua" (Yue, 133), $680K per month would be *significantly* over a normal exit settlement and, my opinion, it would be impossible for anyone at Dahua to agree to that amount.
    - As described above, Chinese labor laws are very pro-employee, but often vague when it comes to settling dismissal disputes. Regional practices and guidelines vary, but according to Chinese labor law, if a company wants to dismiss an employee before their contract term they need to pay, at minimum, one month's base compensation for every year the employee worked for the company, sometimes adding an additional month if the employee has been with the company for a number of years. Mr. Fu mentions the formula that is in the Chinese labor law, a formula everyone knows, "N+1" (Fu, 51).The formula of "N+1" is an important part of the context for exit negotiations, and it influences the offers that employers will extend. Mr. Zhang had been at the company for approximately one year, and where his total base salary was $510,000, his monthly base salary was $42,500. In Mr. Zhang's case, N+1 would be approximately $85,000.
    - If an employee does not like the settlement they are being offered, they can elect to go to labor arbitration through a tribunal at the Labor Bureau. If the labor tribunal brings a judgement against the company that their compensation is insufficient, the tribunal will demand that the company pay the dismissed employee a higher settlement. However, pending other circumstances, my experience in a



**Strictly confidential**

- number of arbitrations tells me that the maximum settlement a labor tribunal would assign in larger cities like Shanghai is two times annual salary. We are constantly monitoring labor arbitration settlements across major cities in China and this is typically the high end of the settlement range.
- Therefore, if Mr. Zhang was thinking in "Chinese business culture" terms, the most he could expect would be two times his annual salary, $1,020,000. The offer of $680,000 was in the appropriate range for such a settlement. The consulting contract of $240,000 for two years would have increased the total compensation to a maximum of $1,160,000 which is actually over the maximum in Chinese business practice.
- The consulting agreement must be understood as part of the settlement for dismissal and, in my experience, the compensation and terms that were offered was within the range of Chinese norms for these types of settlements. The compensation amount in the final agreement ($680K per month for 16 months) is, in my experience, so out of the range of typical settlements in China as to be ridiculous and is clearly a scrivener's error.

# Disclosures

I have not testified at trial or at deposition in the past four years. I am being compensated for my time in this matter at a rate of $750 per hour. My CV and a list of my publications are attached in an addendum.

Respectfully submitted,

*[signature: Kent D. Kedl]*

Kent D. Kedl
Dated: May 28, 2021





# Addendum

Expert witness report from Kent D. Kedl

Strictly confidential

28 May 2021

Client confidential work product

Control Risks Group (Shanghai) Limited | Suite 701, Henderson 688 |
No. 688 Nanjing Road West Shanghai 200041 | China

+86 21 6010 9700    shanghai@controlrisks.com



**Strictly confidential**

The information contained herein does not constitute a guarantee or warranty by Control Risks Group Holdings Limited, its subsidiaries, branches and/or affiliates ("Control Risks") of future performance nor an assurance against risk. This report is based on information provided by the client and other information available at the time of writing. It has been prepared following consultation with and on the basis of instructions received from the client and reflects the priorities and knowledge of the client as communicated to Control Risks. Accordingly, the issues covered by this report and the emphasis placed on them may not necessarily address all the issues of concern in relation to its subject matter. No obligation is undertaken by Control Risks to provide the client with further information, to update this information or any other information for events or changes of circumstances which take place after the date hereof or to correct any information contained herein or any omission therefrom. Control Risks' work and findings shall not in any way constitute recommendations or advice regarding the client's ultimate commercial decision, which shall, in all respects, remain the client's own.

This report is for the benefit of the client only (including its directors, officers and employees) and may not be disclosed to any third parties without the prior written consent of Control Risks.

Copyright © Control Risks. All rights reserved. This document cannot be reproduced without the express written permission of Control Risks. Any reproduction without authorisation shall be considered an infringement of Control Risks' copyright.



**Strictly confidential**

Curriculum Vitae

Kent D. Kedl
kent.kedl@controlrisks.com
+86-136-0191-3061

**TEAM CONTRIBUTIONS**
- 30+ years of global leadership experience
- Deep experience in advising executive committees and boards on crisis management, compliance and investigations, particularly in operational restructuring and labor disputes in China
- Strength and experience in leading international divisions of global companies, from strategy creation to execution
- Varied experience creating successful business alliances, including acquisitions, joint-ventures, franchises and distribution partnerships
- Deep cross-cultural experience and excellent communications skills (business fluency in Mandarin Chinese)

**Control Risks, Asia Pacific**

*Managing Partner, Greater China and North Asia (January 2011 to March 2016 and January 2018 to present)*
- Responsible for the Greater China and North Asia P&L, creating and executing growth strategy
- FY 11 – FY 16, trading profit increased over 400%, from 35 people to 110
- Business expanded to include advising on most of the MNC crisis cases in China during that period
- Acquired a Hong Kong investigations practice to expand our ability to support on FCPA cases
- Created the China Global Strategy for the company and got Board approval to invest in resources across the Group to drive China revenue from all parts of our global business.

A significant part of Kent's practice is to assist multinational companies restructure their China operations, including the investigation and termination of senior leadership, factory closure, investigation and dismissal of third parties (distributors, agents, etc.) and Chinese regulatory investigations, for example:
- Investigating alleged unethical behavior of senior leadership and developing a negotiation strategy and risk mitigation plan to terminate them without going into labor arbitration
- Crafting negotiation strategies for termination of senior management, taking into account statutory minimums benchmarked against other settlements (which tend to be far above statutory minimums)
- Negotiating separation agreements with groups of workers demanding settlements far above statutory requirements
- Responding to threats from angry employees and third parties who allege wrongful dismissal
- Coordinating with government labor organizations to seek pre-approval and support for operational restructuring, including redundancy agreements with factory and management employees
- Investigating unethical behavior of distributors and agents and assisting clients to dismiss them while maintaining business continuity and avoiding litigation

*Senior Partner, Compliance, Forensics and Intelligence, Asia Pacific (April, 2016 to January, 2018)*
- Took a temporary assignment to build an Asia-wide practice modeled on the practice we had built in Greater China.



**Strictly confidential**

- Maintained role as Chairman of the Greater China practice
- Direct management of Ethics and Compliance Consulting and Technology practices – in FY 17 ECC grew 35% and Technology grew 20%
- Implemented practice leadership changes in India and Japan with both practices becoming profitable within six months

### Technomic Asia
*Partner (January, 2000 to December, 2010)*
A Shanghai-based consulting firm specializing in Asia market entry and growth strategies
- Created and implemented market entry and growth strategies for foreign companies across a wide variety of industries
- Responsible for new client acquisition and managing the operation in Asia Pacific (direct operations in China and Singapore with partners in other country markets)
- Multinational clients from Fortune 500 as well as US and European small- to medium-sized enterprises
- Following an acquisition by Tompkins Associates in 2008, led development of supply chain, distribution and warehousing consulting solutions
- NOTE: for a period was seconded to an in-house role with Inscape Publishing (below) but retained financial ownership in, and strategic co-management of, Technomic Asia

### Inscape Publishing
*Director, Global Business Development (September 2001 to June 2003)*
World's leading provider of DiSC©-based classroom learning solutions
- Embedded with client to lead international business development, working with global partners to license, translate and validate behavioral assessment systems and sell educational toolsets in global markets
- Opened new markets in China, Singapore, India, Brazil, the Baltic States and Egypt
- Expanded international penetration by over 50% during very difficult financial times following 9/11
- Created the strategy for – and led the acquisition of – a European-based partner

### eStar Solutions
*Co-founder and Vice President for Business Development (February, 1999 to January, 2000)*
A Singapore-based IT and market solutions firm
- Focused on market strategy and operational IT solutions for small- to medium-sized companies in Asia-Pacific
- Responsible for new client acquisition, developing new practice lines and creating new consulting products
- Profitable and cash-flow-positive within 9 months of start up
- Parent company (Fourth Shift Corp.) was no longer willing to keep the company under their corporate structure so we merged with Technomic Asia, a Shanghai-based market strategy consulting firm

### Fourth Shift Corporation

*Various sales and P&L leadership roles (1994-1999)*
Enterprise Resource Solutions software and consulting solutions, NASDAQ-traded



**Strictly confidential**

East China Regional Manager
- Turn-around P&L management of the company's largest regional office
- Went from an annual loss to 30% net profit margin in two years
- Expanded client base by 50% among multinational companies

Director, Professional Services, Asia-Pacific
- Launch and P&L management of all Asia professional services
- Took services from an average 8% net margin to over 25%

Global Business Director, Asia-Pacific
- P&L responsibility for operations in North Asia (Japan, Korea and Taiwan)
- Responsible for creation and maintenance of key global accounts

Director Sales and Marketing, Latin America
- Created strategic partnerships and sales in new territories across Latin America
- Sold major projects in Brazil, Venezuela, Argentina, Chile and Puerto Rico

**Independent Business Consultant and Graduate Student**
Various roles (1989-1993)
- M.A. in East Asian studies and Ph.D. coursework in International Mass Communications
- Designed and directed multiple Chinese language and cultural exchange programs in China
- Consulted with manufacturers on new product manufacturing and sales in China
- Lectured widely on Asian history, politics and business

**Anhui School of Education**
Foreign Expert, Hefei, China (1988-89)
- Designed and taught curriculum on English language and literature

**EDUCATION**
1987    B.A. English Literature (University of Minnesota)
1993    M.A. East Asian Studies (University of Minnesota)
1995    Ph.D. (ABD) Mass Communications (University of Minnesota)

**LANGUAGES**
English (native)
Mandarin Chinese (business and conversational fluency)

**Publications**:

| COVID-19: How the pandemic has changed China's operating environment | | https://www.controlrisks.com/our-thinking/insights/podcasts/episode-15-how-covid-19-has-changed-chinas-operating-environment |
|---|---|---|



**Strictly confidential**

| Chinese New Year Travel Restrictions | 2/02/2020 | https://www.amcham-shanghai.org/en/article/video-chinese-new-year-travel-restrictions-kent-kedl-control-risks |
| --- | --- | --- |
| Made in China 2025: is your business ready? | 20/02/2019 | https://register.gotowebinar.com/rt/79710591664217602 |
| Made in China 2025: is your business ready? | 12/02/2019 | https://www.controlrisks.com/campaigns/china-business/made-in-china-2025 |
| Outside-in': managing conflicts of interest in China | 29/01/2019 | https://register.gotowebinar.com/rt/6353637188985112323 |
| An 'outside-in' approach to investigating conflicts of interest in China | 17/01/2019 | https://www.controlrisks.com/campaigns/china-business/investigating-conflicts-of-interest-in-china |
| Connections in China: government affairs for risk management | 6/12/2018 | https://attendee.gotowebinar.com/rt/630034851498106369 |
| Government affairs in China means risk management as well as market access | 27/11/2018 | https://www.controlrisks.com/campaigns/china-business/government-affairs-in-china |
| Future-proofing your China business: a view of a changing market | 21/10/2018 | https://www.controlrisks.com/campaigns/china-business/future-proofing-your-china-strategy |
| Emerging Markets: Rethinking M&A | 22/08/2017 | https://www.forbes.com/sites/riskmap/2017/08/22/emerging-markets-rethinking-ma/#3eba17767bac |
| Traditional investigative approaches in Asia | 22/05/2017 | https://www.controlrisks.com/our-thinking/insights/traditional-investigative-approaches-in-asia |
| The changing regulatory environment | 2/02/2017 | https://www.youtube.com/watch?v=WBH2I5lT4rU |
| Compliance is not your mother | 16/01/2017 | https://www.chinabusinessreview.com/dont-treat-compliance-like-your-mother/ |
| India's and China's anti-corruption drives | 14/06/2016 | https://www.controlrisks.com/our-thinking/insights/podcasts/india-and-china-anti-corruption-drives |
| China's Slowing Growth: Managing the Challenge | 27/08/2015 | https://www.youtube.com/watch?v=AbGwGYv4glM |
| Managing a Fraud crisis in China | 18/06/2015 | https://www.youtube.com/watch?v=xfdmmwtuSms&t=19s |
| The Dialogue: Managing Corruption in Asia: What you need to know | 8/06/2015 | https://www.youtube.com/watch?v=rdSBvvg4bz8 |
| Whistling in the Dark | 5/03/2015 | https://www.lexology.com/library/detail.aspx?g=527c02e1-d1a9-46d8-a145-2c413d218f0b |
| Doing Business in China | 2/04/2013 | https://asiasociety.org/video/kent-kedl-doing-business-china |