UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DAHUA TEHCHNOLOGY USA INC., | * | |
| | * | |
| Plaintiff and Counterclaim Defendant, | * | |
| | * | |
| v. | * | Civil Action No. 1:18-cv-11147-IT |
| | * | |
| FENG ZHANG, | * | |
| | * | |
| Defendant and Counterclaim Plaintiff. | * | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

October 21, 2022

TALWANI, D.J.

Dahua Technology USA Inc. ("Dahua"), a subsidiary of Zhejiang Dahua Technology Co., Ltd. ("Zhejiang"), brought this action against Feng Zhang to reform an agreement terminating Zhang's executive-level position at Zhejiang (the "Release Agreement"). Dahua alleged that either mutual or unilateral mistake warranted reformation of the severance amount provided by the Release Agreement and that Zhang's attempt to enforce the mistaken term breached the contract's implied covenant of good faith and fair dealing. Zhang counterclaimed that Dahua's failure to pay him the stated severance amount breached the Release Agreement.

The district court granted Dahua's motion for summary judgment, denied Zhang's cross-motion for summary judgment, reformed the agreement, and entered judgment for Dahua. On appeal, the First Circuit affirmed the district court's determination that Massachusetts rather than Virginia law applied, and the denial of Zhang's motion for summary judgment, but reversed entry of summary judgment for Dahua. Dahua Tech. USA Inc. v. Feng Zhang, 988 F.3d 531 (1st Cir. 2021). The First Circuit found that, on the record before it, "there are at least three triable issues of fact: whether Dahua made a mistake (informing whether any mistake defense is viable),

whether Zhang made a mistake (informing whether a mutual mistake defense is viable), and, if only Dahua was mistaken, whether Zhang knew or should have known of Dahua's mistake (informing whether a unilateral mistake defense is viable)." Id. at 540-41.

On remand, the case was reassigned to this session. The court considered Zhang's Motion to Amend to Add a Counterclaim [Doc. No. 27] against Zhejiang (which Zhang had filed before summary judgment briefing and Dahua had opposed) and denied the motion as untimely. Mem. & Order [Doc. No. 98]. Following an eleven-day bench trial[1] and post-trial briefings and argument, the court makes the following findings of fact and conclusions of law.

## I.  Findings of Fact

### A.  Zhang's Position at Zhejiang

Zhejiang is a publicly listed Chinese surveillance technology company with its headquarters in Hangzhou, China. Liquan Fu founded Zhejiang and serves as its Chairman. He is also the sole director of its subsidiary, Dahua.

In 2015, Zhejiang recruited Feng ("Frank") Zhang for an executive level position overseeing Zhejiang's North American operations as "Chief Strategy Officer, Vice President and President of North American and Enterprise Sales." Zhejiang initially offered Zhang an annual salary between $200,000 and $300,000 and some amount of stock appreciation, but Zhang negotiated for far better terms with several executives, including Fu and Lin ("Tim") Wang, then-head of Zhejiang's subsidiary Dahua. Zhang ultimately signed an employment agreement with Zhejiang (the "2015 Employment Agreement"), that provided for an annual base salary of $510,000, bonuses and incentives based on his "contribution, company performance and

---

[1] Under the Release Agreement, the parties waived their rights to a trial by jury and consented to a bench trial. Tr. Ex. 1, Release Agreement 5 [Doc. No. 49-1].

company policy," and a one-time grant of 100,000 shares of Zhejiang stock. The 2015

Employment Agreement was terminable during its three-year term only for cause (and then still

requiring base salary continuation for the remaining term of the contract), and contained no non-

compete restrictions, confidentiality requirements, or non-disparagement clauses. Pursuant to the

2015 Employment Agreement, Zhang was employed by Zhejiang but was based in the United

States and Dahua paid Zhang's salary and made available to him the standard benefits offered to

Dahua employees. Although the 2015 Employment Agreement stated that the agreement

"represent[ed] the entire agreement between [Zhang] and Zhejiang," Ex. 17, Offer Letter [Doc.

No. 49-17], Wang openly noted during the negotiations that Dahua could only show his salary as

"200 – 300K us dollars."

       Zhang's employment with Zhejiang began on January 1, 2016. In 2016, Dahua paid

Zhang only $193,165.34 of his $510,000 annual salary. Assured by the signed contract that

guaranteed him $510,000 per year, Zhang did not complain to management about the

underpayment. Day 8, 41:25-42:4 ("we already signed the contract, it's something there. It's not

going anywhere. Eventually they're probably going to pay."). Consistent with Zhang's

expectations, Zhang received the balance of his 2016 salary by February 2017. Around the same

time, Zhang also received a $400,000 performance bonus for his work in 2016, totaling $910,000

in compensation for the first year of the three-year contract.

       Despite evidence that Zhejiang was experiencing negative growth in the North American

market in 2017, Zhejiang did not communicate to Zhang any dissatisfaction with his

performance. Day 8, 26:21-27:4; 45:5-21, 46:14-18, 47:14-21.[2] As late as summer 2017, Zhang

construed Zhejiang's communications as affirming his performance. For example, in June 2017,

Zhejiang informed Zhang that he had been nominated for enrollment in the company's stock

ownership plan, an incentive program that allocates a set amount of phantom stock to

participants based on a combination of factors including the employee's "past performance" and

department contributions entitling them to any appreciation on the value of the stock over time.

Through this program, Zhang was awarded the value of 3,000,000 Yuan of Zhejiang stock.

Likewise, when Zhang traveled to the company headquarters in China for his semiannual review

in July 2017, Zhejiang gave no indication that his termination was imminent. Following Zhang's

presentation to Zhejiang board members on his ongoing initiatives and strategic vision for

expanding Zhejiang's North American market share, Fu told Zhang to "carry out the plan" and

Zhejiang CEO Kei Li instructed Zhang "to accelerate the merger acquisition, strategic initiative

stuff." Day 8, 35:18-36:5.

     One such strategic initiative was Zhejiang's planned acquisition of Lorex Technology

Inc. ("Lorex"), referred to internally as Project Mohawk. Lorex had an existing retail business

with significant revenue that Zhejiang was looking to capitalize on to develop a critical foothold

in the retail consumer market for surveillance technology. Zhejiang considered the Lorex

acquisition strategically important to remain competitive with its peers. Zhang began discussing

---

[2] Fu testified that Zhejiang did express to Zhang its dissatisfaction with his performance, see, e.g., Day 2, 27:24-28:10, but the court does not find Fu's testimony persuasive where it was not supported by any documentary evidence of such communications, was devoid of details as to time or place, and did not address the bonuses that Zhang received or the invitation that he interview for the Dahua CEO position.

Project Mohawk in 2016 and Zhang's leadership driving the Lorex acquisition continued through July and August of 2017.

### B. *Zhejiang's Preparations for Zhang's Termination*

By the midway point of 2017, Fu and the Zhejiang board had decided to remove Zhang from the day-to-day management of Zhejiang's North American business. Zhejiang was deliberate in how it approached Zhang's termination and Fu involved others in Zhejiang leadership in developing the company's termination strategy.

Zhejiang's general counsel appointed in house attorney Haiyan Yue to liaise with outside counsel, Cathryn Le Regulski. While Yue had no employment law background, she was versed in the American legal system (having graduated from the University of Michigan School of Law and having passed the New York State Bar Exam) and spoke fluent English. Le Regulski was Of Counsel in DLA Piper's Virginia office where she specialized in employment law. Yue and Le Regulski worked at the direction of Fu and Zhejiang leadership. They were not privy to internal Zhejiang deliberations and were provided only the information that Fu deemed necessary for them to execute their limited role. A third attorney involved in the termination preparation was Qiang Li, a DLA Piper partner based in Asia.

Yue and Le Regulski collaborated on an internal strategy memo that outlined legal options for Zhang's termination, the associated risks, and any available mitigation measures. Despite the strategy memo centering on the terms in Zhang's 2015 Employment Agreement, the copy of the agreement provided to them had Zhang's annual base salary redacted.

The version of the strategy memo entered into evidence was Yue's draft, with Le Regulski's additions marked with underlines and her deletions with a strike-out line. Tr. Ex. 127 at 957. It read, in part, as follows:

According to Frank's offer letter, the term of employment is 3 years. <u>Typically, when an employment agreement in the US provides for a specified term of employment, the contract also specifies the events that permit an early termination and the termination pay required in each such event. Frank's offer letter states that his employment can be "terminated by Dahua for cause" and, in that case, Dahua will pay Frank's full base salary for the remainder of the 3-year term. Dahua may also terminate Frank's employment if he engages in illegal conduct or company misconduct (such as embezzlement or policy violations) and, in such event, Dahua only needs to compensate Frank through the last day worked. Of course, Frank may always elect to resign his employment. Therefore, unless Dahua has a basis to terminate Frank for cause or due to illegal conduct or misconduct, t</u>~~To~~ terminate the employment contract earlier constitutes breach of contract and Dahua will need to pay for Frank's damages. The amount of damages would be one that make[s] Frank whole if we did not breach it. Therefore, it would include not only his compensation for 3 years, but also all the benefits, such as health and retirement benefits<u>, that he would have enjoyed had his employment not been terminated, and any other actual damages that he suffered as a result of not being employed for the promised period</u>, ~~the satisfactory feeling of having such a job, the advantage of getting the next job while employed, etc~~.

<u>Id.</u>

Among the risks posed by termination articulated in the strategy memo was Zhang bringing a claim for breach of contract and Zhang's possible use of insider knowledge to disparage the company or "act as a whistleblower and blow the whistle on vulnerability of [Zhejiang] products or operations." <u>Id.</u> at 957-58; <u>see</u> Ex. 12, internal email from Yue to Le Regulski [Doc. No. 49-12] (stating that new offer letter needs to include that Zhang will "keep confidential the information of the Company" and "agree that he will not hurt the Company in the future"). Specifically, the memo articulated a concern that Zhang could publicize certain serious product-related security issues the company had been concealing.[3] Ultimately, Yue and Le Regulski concluded that the "[b]aseline of the severance package" would require: (1) salary, bonus and other benefits from the date of termination through the end of the three-year term and

---

[3] The court finds that this security issue (detailed in sealed testimony) was a significant issue that Zhejiang was able to keep secret until it was resolved.

(2) "[a]dditional compensation to entice him to release all claims against Dahua." Tr. Ex. 127 at 958-59 [Doc. No. 46-11]. Yue and Le Regulski did not weigh in as to the amount of such compensation and the strategy memo includes no information as to why Zhejiang wanted to terminate Zhang.

On August 23, 2017, in further preparation for Zhang's termination, Yue asked Le Regulski to "help [] draft a separation agreement with Frank Zhang." Tr. Ex. 7, at 1024-25. On August 24, 2017, Qiang Li reported that Le Regulski would make herself available for Fu's negotiation with Zhang and that DLA Piper would prepare a termination agreement for Yue's review. He also suggested "a strategy call . . . to make sure we are on the same page re strategy and the full picture." Id. The next day, Yue followed up with "some updates," telling Li and Le Regulski that Fu and "the new head of American Region" would fly to Boston and speak with Frank privately. Id.

On August 27, 2017, following their strategy call that morning, Le Regulski wrote to Yue that she "neglected to reiterate a strategy point . . . . In [Fu's] discussion with Frank, it would be helpful for Frank to believe that the company has the basis to terminate his employment for misconduct due to his failure to follow corporate policies but, rather than go that route, we are willing to allow him to remain with the company in a different capacity." Ex. 134 [Doc. No. 65-3]. Le Regulski acknowledged that she didn't know "how strong of a case the company has to terminate for misconduct, but I think we should try to take this position for now." Id. She also advised Yue to "start collecting evidence on the types of actions that Frank has taken that we could use to support a termination for misconduct in the event Frank does not want to cooperate." Id. Nothing in the record at trial suggests that Zhang had engaged in any misconduct.

Also on August 27, 2017, Le Regulski circulated a form consulting agreement to Yue and they exchanged comments. Later that night, Le Regulski sent Yue a draft separation agreement.[4]

### C.  Zhang and Fu's Conversation at the Hotel

As planned, Fu traveled to Waltham to conduct the exit negotiations and oversee the subsequent transition in leadership. Other members of the Zhejiang team who traveled to Waltham to support Fu included Yue, another in house lawyer Bo Li, Wang (who by now was Zhejiang's Vice Chairman), Finance Director Jason Zhu, HR Representative Lynette Lv, and incoming leader of North American operations William Chou. Fu continued to be supported by outside employment counsel Le Regulski (from Virginia) and Qiang Li (from Asia).

Just before boarding his flight from China and without revealing the purpose of his visit, Fu informed Zhang he was traveling to the Waltham office. Zhang met Fu when he arrived at the airport on the evening of August 27, 2017, and drove him to his hotel. During the drive, they chatted about their families, and Fu told Zhang that he was "considering asking . . . young guys to run the business." Day 8, 51:9-17. But it was late, so they agreed to talk more in the morning.

---

[4] The draft separation agreement contained a term for the continuation of Zhang's salary for an unstated number of months. Tr. Ex. 7 at 1037. The continuation of salary concept reflected what Yue and Le Regulski understood "under Massachusetts law, what should be owed to [Zhang]" because Yue had not yet "talked to the top management about their decision" regarding the severance amount. Day 4, 53:2-24. Le Regulski commented in a footnote to the separation benefits provision that "[t]his paragraph is currently drafted to provide a cash severance payment in the event [that] Frank declines to become a consultant. However, even if Frank decides to become a consultant, we should consider having Frank sign this separation agreement in addition to the consulting agreement so that Dahua can get the benefit of the release of claims but, in lieu of the cash severance payment, we will revise this section to have the consulting agreement serve as consideration for the release." Ex. 7 at 1037 n.1.

Zhang returned to Fu's hotel the next morning to discuss the details of Fu's planned changes to the company's North American leadership.[5] There, Fu informed Zhang that he wanted to transition Zhang to a different position within Zhejiang. He first asked Zhang if he would be interested in a "senior management" position at Zhejiang's headquarters in China. Zhang declined, telling Fu that he did not want to move to China while his children were in school in the United States. Zhang understood Fu to be offering as an alternative that Zhang serve as a senior corporate advisor to "keep running Project Mohawk." Day 9, 53:6-20. Fu also assured Zhang that in the new role "there's other things [he] could help with" "in mainly [the] USA," including helping the young person who would take over running Dahua. Id. at 53:7-23. Zhang told Fu he would be happy to take on this role, but first wanted to know how Zhejiang would resolve the remaining terms of the 2015 Employment Agreement. Fu told him, "we will follow whatever the agreement says" and Zhang responded "if he can take care of the agreement, I'm ok." Day 8, 54:21, 55:2-3. Zhang also asked Fu about his outstanding interest in Zhejiang stock. Fu assured Zhang that they would "take care" of the shares of Zhejiang stock but gave no specifics. Day 9, 46:18-19.

Zhang asked what Fu would ask him to sign in connection with these changes, and Fu said that the company would "make sure you're comfortable, treat you well." Day 8, 56:5-6. Zhang "thanked him for that." Id. at 55:22-56:6.

_____

[5] Fu and Zhang's recollection of this conversation differed in numerous respects. Those differences were compounded by Fu conflating when different events occurred. For example, in describing the agreement purportedly reached that morning at the hotel, Fu referenced conversations that had purportedly occurred later that day in the office in Waltham, months later when Zhang travelled to China, and at some indeterminable "end." Day 2, 45:6-7; id. at 47:8-10. Where the testimony directly conflicted, the court generally found Zhang's version more credible.

When their discussion at the hotel concluded, Zhang believed that he had an agreement with Fu to transition within Zhejiang from his position as Chief Strategy Officer, Vice President and President of North American and Enterprise Sales to a senior corporate adviser role for a guaranteed two-year term, with a $240,000 annual salary in addition to his salary under the 2015 Employment Agreement. In Zhang's view, "we're both very happy" because "[Fu] said he's going to take care of the contract [and] I'm going to keep working with the company." Day 9, 55:14-19.[6] Understanding the impetus for the transition to be, at least in part, Fu's desire to move Zhang into a role dedicated to the company's high priority strategic retail initiatives, Zhang did not consider the change to be a demotion.

The negotiation at the hotel, described above, was Zhang's only substantive discussion with Fu concerning the termination of his 2015 Employment Agreement and the terms of a new agreement.

Upon concluding their conversation at the hotel, Fu stepped away to make a phone call. The content of that call is not in the record. Upon his return, he told Zhang, "we're all set." Day 8, 56:20-24. Zhang then drove Fu the short distance to the Waltham office where they spent the rest of the day.

D. *Events at the Dahua Office*

At the office, Yue presented Zhang and Fu with several sets of draft separation documents, all prepared exclusively in English. Fu cannot read English and did not have any of the separation documents translated into Mandarin, though he did sign off on all of them.

---

[6] At one point during his testimony, Zhang relayed the following conversation: "Mr. Fu asked me to work on headquarter [sic], I said no. He asked me to work on consultant. I said okay." Day 8, 62:1-2. The court understands the term "consultant" in context to mean someone providing expert advice, and not to mean an independent contractor.

1.  The First Set of Documents Presented to Zhang

Yue emailed Le Regulski her understanding of Zhang's separation terms, presumably based on what Fu conveyed to Yue or someone else during the phone call from the hotel. She wrote "[i]t's been decided: Frank will serve as a consultant. Dahua will pay him the remaining 16 month salary plus a monthly consulting fee. The consulting period is 2 years." Tr. Ex. 8 at 1064. Le Regulski told Yue she would incorporate these points into the draft agreements. But the revised agreements did not fully incorporate Yue's points (let alone what Fu had said to Zhang).

The draft consulting agreement Le Regulski had forwarded to Yue before the negotiation provided that Zhang would contribute consulting services "upon the request of the President of Dahua," for a term to be filled in, but that the consulting arrangement could be terminated "for any reason or no reason upon thirty (30) days' advance written notice." Tr. Ex. 7 at 1028-33. After receiving the email from Yue, Le Regulski added a "twenty-four (24) month[]" term into the draft consulting agreement, but did not eliminate language permitting termination "for any reason or no reason." Tr. Ex. 8 at 1081. She also did not add salary continuation to the separation agreement. Rather, as she had suggested in the footnote to the original draft agreement, she described the consideration for the separation agreement to be the consulting agreement.[7] The separation agreement was thus drafted to terminate Zhang's employment at Zhejiang, release Dahua and Zhejiang of liability, and bind Zhang to confidentiality and non-disparagement clauses, and in exchange give Zhang the opportunity to consult as an independent contractor on ad hoc projects for an hourly fee and on an at-will basis. Instead of an employment agreement for a two-year term with Zhejiang and continuation of his existing rights and benefits, the consulting

---

[7] Le Regulski explained to Yue later that day that she had been under the mistaken impression that severance would be paid out as the consulting fees.

agreement included no guarantee of work, or entitlement to any of the rights or employee benefits he had under the 2015 Employment Agreement.

   2.   Zhang's Rejection of the First Written Offer

Zhang believed that he and Fu had reached an agreement on the material terms of his role change within Zhejiang, and that Zhejiang would provide a written agreement reflecting those terms for him to sign. The terms of the proposed separation and consulting agreements prepared by Le Regulski and Yue and presented to Zhang at the office were entirely at odds with what Zhang understood Fu had offered him that morning. Rather than transferring Zhang to a new executive role at Zhejiang with additional salary and continuation of his employment benefits and protections, the separation and consulting agreements, if accepted by Zhang, would have ended his employment with Zhejiang entirely and left him with only a terminable at will outside consultant position with Dahua. Day 4, 28:1-5 ("Frank . . . read the agreements, and he pointed out the wording of 'outside consultant.' And he said to Mr. [Fu], he would rather be an inside consultant."). Zhang was particularly unhappy about the "at-will" arrangement. Day 9, 58:5-25 (Zhang "point[ed] out the at-will portion, which is supposed to be two years, senior corporate advisor employment contract, not at-will"), 59:1-5 (Zhang testified "[t]hat's the moment I'm not very happy with the company, because what we discussed, agreed on, in the morning, is not reflected in the first version."). Moreover, the documents failed to include the compensation Fu promised Zhang for his new role and to compensate him for his 2015 Employment Agreement.

When Zhang realized the proposed contracts fell far short of what Fu had discussed, Zhang rejected them, telling Yue to "[g]o sync up with Mr. Fu" because "[t]his is not what I discussed with Mr. Fu. And, also, this is not what Fu said, treat me well." Day 8, 62:11-19; Day

9, 58:5-25 ("This is not what I discussed with Mr. Fu in the morning at the hotel. Please sync up with him.").

Frustrated with what he viewed as bad faith bargaining, Zhang looked for leverage he could assert to regain footing in the negotiation. He spoke with HR director Lynette Lv and told her that he believed he could "publish books, business cases" based on his experience at Zhejiang to "make millions of dollars." Day 8, 66:3-18. When Lv asked if he was serious, Zhang said "why not? As far as [I'm] not violating the confidentiality agreement, I should be fine" and only "if the company [can] prove it." Id. at 66:20-25. These concerns hit on the same fears expressed in the strategy memo drafted in preparation for Zhang's termination.

3.  Zhejiang's Internal Deliberations and Preparation of New Offer Documents

After Zhang rejected the first written offer, members of the Zhejiang board deliberated over next steps. Terminating Zhang's 2015 Employment Agreement was an essential point of their deliberations. Zhejiang's board sought to do so in a way that imposed confidentiality and other restrictions on Zhang, left Zhang willing to "keep confidential the information of the company," and disincentivized Zhang from "hurt[ing] the company in the future."[8]

While Fu may have viewed the two year arrangement he had verbally offered Zhang to be necessary to induce Zhang to leave his leadership position at Zhejiang while still believing it was in his interest to protect the company, "[some] people objected to the [employee] arrangement." Tr. Ex. 11 at 1271.

---

[8] But Zhejiang's concerns about Zhang's ability to harm the company were time limited. Zhejiang needed to prevent Zhang from revealing the security flaw before it was resolved and interfering with the Lorex acquisition closing within the next few months.

While Zhejiang leadership was debating these issues, Le Regulski prepared different versions of the agreements. In an email to Le Regulski, Yue wrote:

> So let me repeat what we discussed over the phone just to make sure that there is no misunderstanding:
>
> 1. Frank reviewed the separation agreement and he doesn't like it.
>
> 2. He and the boss decided on the spot that he will remain an employee of the Company, and his new title is senior corporate advisor
>
> 3. In the new offer letter, please make sure to include the following provisions (and all others that you normally have in such type of agreements);
>
>> a) The original offer letter is terminated.
>>
>> b) Keep confidential the information of the Company
>>
>> c) Because he was the CEO before and he knew much of the inside information of the Company, he needs to agree that he will not hurt the Company in the future.

Tr. Ex. 12 at 1312.

Yue also told Le Regulski that "things are not certain" as to Zhang's continuing employment, so they continued to work on two sets of contracts. Tr. Ex. 11 at 1271. In one email to Le Regulski Yue stated that she had "added the 16 month payment provision to the separation agreement." Id. The email included no information as to the amounts of the payment or Zhang's salary (under either the 2015 Employment Agreement or the new offer). At another point, "top management" sent Yue a revised separation benefits term for the separation agreement that provided for severance payments "in the amount of USD$680,000" and "the value of the appreciation of 100,000 shares of common stock of Zhejiang Dahua Technology Co. Ltd. from January 1, 2017 to August 28, 2017," with "[p]ayment arrangement of the separation benefits . . . decided later by mutual agreement." Tr. Ex. 25 at 1227; Compare Tr. Ex. 11 at 1279 with Ex. 69 at 1628. But nothing in this communication suggested that the $680,000 had any relationship to

14

Zhang's salary, and this paragraph, with the "appreciation of 100,000 shares" and separate

payment arrangements for the separation benefits, was not included in the release agreement.[9]

Ultimately, the Zhejiang board decided to offer Zhang a senior corporate advisor position

at Dahua, contingent on Zhang's termination of the 2015 Employment Agreement with Zhejiang

and acceptance of the confidentiality and non-compete restrictions and releases presented in the

earlier offer.

Le Regulski advised Yue that to present the new offer to Zhang, the prepared agreements

would need to be modified. Accordingly, in lieu of the consulting agreement and separation

agreement, Le Regulski prepared a new employment agreement and a release agreement. Le

Regulski's draft of the new employment agreement provided that Zhang would hold the position

of "Senior Corporate Advisor," and described the role as "performing such duties as are assigned

to you from time to time, subject to the oversight and direction of the President of Dahua or his

designee." See Tr. Ex. 48 at 1378, 1381-82. The agreement also included restrictions on

information sharing and limitations on the solicitation of customers and employees. Her draft

included no term of employment and expressly provided that the position would be at will,

terminable without advance notice, with or without cause. It also had a blank for the salary

amount.

The draft release agreement terminated Zhang's 2015 Employment Agreement rather

than terminating his employment at Zhejiang or Dahua altogether. It listed "monthly severance

payments to [Zhang] in the amount of $_____ for sixteen (16) months following the

_____

[9] At the advice of Zhejiang's tax counsel, all references to Zhang's interest in Zhejiang stock were ultimately removed from the agreements and were replaced with a waiver of his right to any interest in stock. Zhang and Fu entered into a separate oral agreement concerning the resolution of Zhang's outstanding stock interests. See infra Section I(E).

Separation Date . . . ," subject to the same conditions and releases in the earlier separation agreement. Tr. Ex. 12 at 1313. As Le Regulski explained, "I typically prefer to pay over time . . . so that you can buy good behavior from him, such as nondisparagement." Tr. Ex. 39 at 1227. Because Zhejiang did not disclose Zhang's salary to Le Regulski (or Yue), Le Regulski did not calculate the monthly amounts to be paid under the Release Agreement and left the monthly payment amount blank in the version she sent to Yue.

Further changes were made to Le Regulski's drafts by Yue (or others on her team) before they were presented to Zhang. The final version of the new employment agreement ("2017 Employment Agreement") eliminated any reference to the position being "at-will," and provided that "the term of employment is (2) years." Tr. Ex. 13.[10] The final version also had a modified reporting structure. Where the first offer had Zhang reporting to and "subject to the oversight and direction of the President of Dahua," Tr. Ex. 48 at 1378, the final version had Zhang "subject to the oversight and direction of the sole director of the Company," which was Fu. Tr. Ex. 13. This version also had the salary filled in, specifying an "initial salary" at the rate of "$10,000 biweekly, which equates to $240,000 on an annualized basis." Id.

The final version of the Release Agreement also had a few changes from the version Le Regulski sent to Yue, including the addition of a dollar amount for the separation payment. The final version provides: "[t]his letter agreement (the *"Agreement"*) memorializes the terms we have agreed to with respect to the termination of your Offer of Employment dated November 5, 2015, with Dahua Technology USA Inc. (the *"Company")* and its parent, Zhejiang Dahua Technology Co. Ltd. *("Parent")*." Tr. Ex. 1. It continues:

_____

[10] This two-year term did not include the robust protection against early termination contained in the 2015 Employment Agreement.

16

> 1. Payments. In consideration for your execution, non-revocation and compliance with this Agreement, the Company agrees to make monthly severance payments to you in the amount of $680,000 for sixteen (16) months following the offer termination Date (the "Severance Period"), payable subject to standard payroll deductions and withholdings on the Company's ordinary payroll dates over the Severance Period, beginning no later than the Company's second payroll date that occurs after the Effective Date (as defined below), provided the Company received the executed Agreement from you by such date, with the remaining installments after that occurring on the Company's regularly scheduled payroll dates. Such payment can be accelerated upon your request, and you will be responsible for any tax associated with the payment, including any tax required under Section 409A of the Internal Revenue Code, as amended, and the regulations and other guidance thereunder and any state law of similar effect.

Id. In addition to the payment provision, the final version contains: (i) a general release of all claims against Dahua and Zhejiang arising out of his employment, but excluding inter alia, "any claims for breach of [the Release] Agreement;" (ii) a non-competition clause applicable while Zhang is receiving severance payments that bars work with a Dahua or Zhejiang competitor doing business in the United States or China; (iii) a mutual non-disparagement clause; (iv) a confidentiality clause as to the "contents and all information pertaining to [the] negotiations" and the agreement;  (v) contingent separation benefits that require Zhang's compliance with the agreement's terms to receive and retain the severance payments; and (vi) acknowledgments that (a) the agreement "relinquish[es] any or all rights [Zhang] ha[d] or may have [had] with regard to the stocks of Parent or the Company as defined in the offer letter dated November 5, 2015" and constitutes a "waiver and release" of claims "to anything of value to which [Zhang] [was] already entitled" and that (b) "this Agreement is a full and accurate embodiment of the understanding between you and the Company, and that it supersedes any prior agreements or understandings made by the parties, including the Offer of Employment between you and Dahua dated November 5, 2015, which shall be terminated in all respects, but excluding the offer letter entered into by the parties of even date." Id.

Both documents expressly supersede the 2015 Employment Agreement and cross reference each other. Though drafted in two separate documents, Dahua considered the agreements to be integrated. See, e.g., Compl. [Doc. No. 1]; Tr. Ex. 15 (summarizing agreements' terms "[a]fter confirming the two agreements are considered together . . .").

    4.   Execution of the Final Agreements

After finalizing the Release Agreement and 2017 Employment Agreement, Yue brought them to Zhang and Fu.

Yue asked Zhang to review the 2017 Employment Agreement "with [the Release Agreement] going together," Day 8, 99:15-16, 101:2-13, and informed him he had the right to engage counsel, which he declined.

Following a ten to fifteen minute review, Fu and Zhang signed both agreements. Day 8, 68:20-22, 92:11 ("Mr. Fu signed it next to me first. I signed it second."). The agreements were drafted in English, and despite his inability to read or understand them, Fu signed the documents without having them translated.

### E.  Zhang's Employment as Senior Corporate Advisor

Over the next few months, Dahua did not pay $680,000 per month as set forth in the Release Agreement but "continued to pay [Zhang] the same amount that had been paid under the prior [2015 employment] agreement . . . at the rate of USD $510,000 a year." Day 9, 83:2-13. Beginning in September 2017, Zhang also began receiving a salary in the amount of $20,000 per month for his work as a Senior Corporate Advisor pursuant to his 2017 Employment Agreement.

In November 2017, Fu called Zhang and asked him to travel to China to collect a payment for the stock appreciation. Zhang then traveled to Zhejiang's headquarters in China where he met with Fu at his office before Fu's secretary "handed [Zhang a] bag of the money."

Day 8, 103:8-11. The bag contained the equivalent of $240,000 in Yuan, which Fu represented to Zhang was a cash payment for the amount owed in connection with the stock-related compensation promised in Zhang's 2015 Employment Agreement.

### F.  Zhang's Separation from Dahua

Less than five months into Zhang's two-year term as a Senior Corporate Advisor, Dahua terminated his employment. On January 10, 2018, Dahua's VP of Human Resources Yong Ying informed Zhang by email that he was being terminated and enclosed a "Confidential Separation Agreement and Release" for Zhang's consideration and signature. The proposed separation agreement sought the "terminat[ion] in all respects" of "the Offer of Employment between [Zhang] and Dahua dated August 28, 2017," and a complete separation from Dahua. Tr. Ex. 23. It included a release of all claims against Dahua and Zhejiang, a new non-competition agreement barring any work with a Dahua or Zhejiang competitor doing business in the United States or China for two years, and a mutual non-disparagement clause. It also tied Dahua's severance obligation to Zhang's ongoing compliance with the agreement's terms. Id. ("In consideration for [Zhang's] execution, non-revocation, and compliance with this Agreement, the Company [offered] to make severance payments to [Zhang] in the amount of $910,000"). Zhang did not sign the separation agreement, reporting that his attorney would be reviewing and negotiating the terms of his separation, and "formally request[ed] the payment acceleration of the agreed to severance amount defined in the first term" of the 2017 Employment Agreement. Tr. Ex. 16, email from Zhang to Ying. On January 29, 2018, Zhang's attorney formally rejected Dahua's severance offer. She wrote:

> We have had an opportunity to review the Confidential Separation Agreement the Company proposed to Mr. Zhang on or about January 10, 2018 ("January 2018 Separation Agreement"). In connection with our review of that document, we have also reviewed certain of Mr. Zhang's prior agreements with the Company,

including, without limitation, two agreements dated August 28, 2017.

Based on our review, we have concluded that, pursuant to existing and enforceable contracts between the parties, . . . the Company is already contractually obligated to pay Mr. Zhang over $11,000,000; the Company has failed to honor its contractual obligations to pay him certain amounts pursuant to these contracts[.]

Tr. Ex. 18 at 1.

Le Regulski responded in a letter dated February 5, 2018. Tr. Ex. 19. She wrote that

Dahua had

just learned that there is a scrivener's error in the Release Agreement, such that the wording of the agreement with respect to the severance amount does not comport with the intention of the parties. Specifically, the Release Agreement on its face provides for a monthly severance payment of $680,000 for 16 months, rather than what the parties intended, which was a monthly severance payment of $42,000 for 16 months, totaling $680,000.

Id. at 1. She denied that Dahua had any obligation to Zhang under the Release Agreement over $680,000 and asked that the Release Agreement be reformed through amendment, which she provided for Zhang's signature. Zhang's counsel refused reformation on his behalf and a series of letter correspondence between counsel ensued with escalating contention, ultimately culminating in this action.

The parties agree that since August 28, 2017, Dahua has paid Zhang $680,000 in severance in connection with the Release Agreement and $480,000 in salary promised in the 2017 Employment Agreement.

## II.    Conclusions of Law

Dahua raises mistake both in its affirmative claim for reformation of the Release Agreement and in its defense to Zhang's counterclaim for breach of the Release Agreement. The elements of the affirmative claim for reformation and the contract defense are similar, but not

identical, and accordingly, the court addresses Dahua's claims first and then Zhang's counterclaim.

    A.   *Dahua' Claims*

       1.  Reformation

Reformation of a contract serves "to effectuate the agreement intended by the parties to a contract where the contract language fails to capture that agreement." <u>Caron v. Horace Mann Ins. Co.</u>, 466 Mass. 218, 223, 993 N.E.2d 708(2013); <u>Polaroid Corp. v. Travelers Indem. Co.</u>, 414 Mass. 747, 756, 610 N.E.2d 912, 917 (1993). "Central to this doctrine is the fundamental underpinning that the parties had reached an agreement on a point which they intended to enshrine in the written contract but which, for some reason, was mistakenly omitted from that written contract." <u>Caron</u>, 466 Mass. at 223 (citing <u>Sancta Maria Hosp. v. Cambridge</u>, 369 Mass. 586, 595-96, 341 N.E.2d 674 (1976) and <u>German Am. Ins. Co. v. Davis</u>, 131 Mass. 316, 317 (1881)). "The mistake that [the plaintiff] must demonstrate—to a high degree of certainty—is not that the outcome of its agreement differed from its expectations, but rather that the contract language did not express the agreement as originally intended. <u>OneBeacon Am. Ins. Co. v. Travelers Indem. Co. of IL</u>, 465 F.3d 38, 42 (1st Cir. 2006); <u>see also</u> Restatement (Second) of Contracts § 155 cmt. a ("The province of reformation is to make a writing express the agreement that the parties intended it should"). To reform a contract, the court must therefore find "that the precise terms of a contract had been orally agreed upon between the parties, and that the written instrument afterwards signed fails to be, as it was intended, an execution of the previous agreement." <u>German Am.</u>, 131 Mass at 317.

Dahua contends that both parties entered into the Release Agreement with the understanding that Dahua would pay Zhang a total of $680,000 in severance—not $680,000 *per*

*month* for sixteen months as written—and that reformation is therefore warranted based on mutual mistake. At a minimum, Dahua argues that the company mistakenly listed $680,000 as the monthly payment, and that even if Zhang was not mistaken, he knew or should have known it was a drafting mistake by Dahua and thus reformation of the severance amount based on unilateral mistake is available.

Although Dahua argues that there was a verbal agreement for $680,000 in severance, it points to no specific oral agreement. Negotiations between the parties at the Waltham office consisted only of presentation and rejections of written drafts, and accordingly, the court considers whether the discussions between Fu and Zhang at the hotel amounted to an oral agreement that Zhang and Dahua intended to enshrine in the written agreement.[11]

When Zhang and Fu concluded those discussions, Zhang believed Fu had proposed that Zhang would give up his role as Chief Strategy Officer and Vice President and President of North American and Enterprise Sales and would instead serve as a senior corporate advisor for Zhejiang, focusing on the parent company's high priority retail-based strategic initiatives. It was in connection with this transition within Zhejiang that he would be paid an additional $240,000 per year for two years while continuing to receive the salary and benefits for the remaining sixteen months of the contract. But Dahua does not seek to reform the Release Agreement and the 2017 Employment Agreement to conform to any such agreement of continued employment with Zhejiang.

---

[11] Because a party seeking reformation of a contract "is not asking the court to interpret the contract but rather to change it to conform to the parties' intent," "the usual restrictions on contract interpretation, such as the parol evidence rule, do not apply to [the] court's inquiry. OneBeacon Am. Ins., 465 F.3d at 41. Accordingly, even where a contract is unambiguous on its face, "[a] court still will accept extrinsic evidence in evaluating a claim that both parties to the contract intended it to say something else." Id.

The agreement Dahua seeks to enforce concerns Zhang's release of claims and acceptance of new restrictions in connection with the termination of the 2015 Employment Agreement with Zhejiang and his new position with Dahua. But Zhang and Fu had no discussion about Zhang separating from Zhejiang or agreeing to these restrictions. Fu first suggested that Zhang continue working for Zhejiang at its headquarters in China, and then suggested that he serve as a senior corporate advisor. They did not discuss terminating Zhang's employment with Zhejiang and did not discuss a Release Agreement at all. Where Zhang's separation of employment from Zhejiang and the additional restrictions were not discussed at all, the court finds no prior oral agreement to which the Release Agreement can be reformed to reflect.

Dahua focuses on Fu's promise that Zhang would continue to receive what he was entitled to under the 2015 Employment Agreement. Dahua translates this promise as equal to the remaining salary under that agreement, which totaled $680,000. But what Zhang was entitled to under the 2015 Employment Agreement was not just his salary, but a position with the parent company rather than its subsidiary, and 16 months of protection from termination of his employment (compensable with additional damages if he was terminated early).

In any event, if there was any prior oral agreement, the agreement would be with Zhejiang, not Dahua. While Fu served as both the sole director of Dahua and Chairman of Zhejiang, when he made his offer for Zhang to continue in a different role at Zhejiang, the offer was necessarily on behalf of the parent company, as the subsidiary would have no authority to offer Zhang a position with the parent. It may well be that Fu did not have authority to offer Zhang a different position at Zhejiang, where the Board had made the decision to terminate

Zhang. But that possibility does not mean that Fu made an offer for a position at Dahua or that Zhang had agreed to end his employment with Zhejiang.[12]

In sum, the court finds that there was no prior oral agreement with Dahua concerning Zhang's separation of employment from Zhejiang. The court "will not decree reformation unless [it] is convinced that the parties expressed agreement and an intention to be bound in accordance with the terms that [it is] asked to establish and enforce." Sancta Maria Hosp., 369 Mass. at 595. Accordingly, the court is unable to reform the written agreement to a prior agreement of the parties here and thus will enter judgment for Zhang and against Dahua on Dahua's claim for reformation.

2.   Covenant of Good Faith and Fair Dealing

Dahua alleges that Zhang breached the Release Agreement's implied covenant of good faith and fair dealing by seeking to enforce a term he knew or should have known was included

---

[12] Dahua and Zhejiang are not interchangeable. Only Dahua, and not Zhejiang, brought this suit, and Dahua opposed Zhang's motion to amend his counterclaim to add Zhejiang as a counterdefendant. As the court explained in connection with that motion:

> As early as 2015, Zhang either knew or should have known that Dahua was a separate entity from its parent company as the 2015 employment agreement makes this distinction clear. See Complaint, Exhibit 2 [#1-2] (stating that Zhang would be employed by Zhejiang but paid by Dahua). Nor can Zhang plausibly contend that he was reasonably proceeding in this action under the presumption that Dahua was standing in for Zhejiang. For one, Dahua's Complaint [#1] and Zhang's Answer [#18] acknowledge that Dahua and Zhejiang are separate entities and specifically identify only Dahua as the party to this action. Moreover, throughout discovery, Dahua made plain that Dahua was the party to this action whereas Zhejiang was the party's parent company. See Dahua Opp'n, Ex. C [#34-3] (Dahua noting, in its initial disclosures, that some of the disclosed individuals worked for Dahua and others for Zhejiang); Dahua Opp'n, Exs. F and G [#34-6], [#34-7] (Dahua objecting to Zhang's definition of "Dahua and You" since it included non-party Zhejiang).

Mem. & Order 7 [Doc. No. 98].

24

in error, thereby entitling Dahua to damages in the form of its attorney's fees. But the implied covenant may not "be invoked to create rights and duties not otherwise provided for in the existing contractual relationship." Uno Rests. V. Bos. Kenmore Realty Corp., 441 Mass. 376, 385, 805 N.E.2d 957 (2004). Accordingly, the claim for attorney's fees is denied.

The court notes further that Dahua's claim is misplaced here. In every contract there is an implied covenant of good faith and fair dealing, which provides "that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Anthony's Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 471, 583 N.E.2d 806  (1991). To demonstrate a breach of the covenant of good faith and fair dealing, one must show that a party to the contract did not deal "honestly and in good faith in both the performance and enforcement of the terms of their contract." Hawthorne's, Inc. v. Warrenton Realty, Inc., 414 Mass. 200, 211, 606 N.E.2d 908 (1993).

Here, there is no suggestion that Zhang failed to abide by the contract terms: he maintained the confidentiality of company information, did not compete, and performed his obligations as requested. Only after Dahua terminated Zhang without cause less than five months into the 2017 Employment Agreement's two year term, did Zhang seek to enforce the Release Agreement. Dahua's claim that Zhang violated his covenant of good faith and fair dealing after Dahua terminated him falls flat.

### B.  Dahua's Defense

In his counterclaim, Zhang asks the court to find Dahua breached the Release Agreement by not paying him the $680,000 per month severance set forth in the document. Dahua raises affirmative defenses of mutual or unilateral mistake, contending that Dahua's last offer – made in the form of the Release Agreement and the 2017 Employment Agreement – contained a

mistake and that Zhang was either also mistaken or knew or should have known it was a mistake when he accepted the offer.

If successful, this defense does not support reformation of the contract but rescission. "Where there has been a mistake between the parties as to the subject matter of a contract, there has been no 'meeting of the minds,' and the contract is voidable at the election of the party adversely affected." LaFleur v. C.C. Pierce Co., 398 Mass. 254, 257-58, 496 N.E.2d 827 (1986). Because the result is no contract, rather than a reformed contract, the elements are somewhat different. No prior oral agreement is needed. Instead, "[t]o assert a mutual mistake defense, a party must show that (1) the contract contained a mistake when it was made; (2) the mistake is shared by both parties; (3) the mistake relates to an essential element of the bargain; and (4) the party raising the defense did not bear the risk of mistake." Dahua Tech., 988 F.3d at 539 (citing LaFleur, 496 N.E.2d at 830-31 and Restatement (Second) of Contracts § 152 (Am. Law Inst. 1981)).[13] For a unilateral mistake defense, a party must show "that (1) the contract contained a mistake when it was made; (2) one party made the mistake; (3) the mistake relates to an essential element of the bargain; (4) the party raising the defense did not bear the risk of mistake; and either (5)(a) the effect of the mistake makes the contract unconscionable or (5)(b) the party not raising the defense had reason to know of the mistake or caused the mistake." Id. (citing Nissan Automobiles of Marlborough, Inc. v. Glick, 62 Mass. App. Ct. 302, 307, 816 N.E.2d 161 (2004) and Restatement (Second) of Contracts § 153 (Am. Law Inst. 1981)).

---

[13] Massachusetts law adopts the principles set out in the Restatement (Second) of Contracts for the recission of contracts. See Covich v. Chambers, 8 Mass. App. Ct. 740, 749, 397 N.E.2d 1115 (1979).

Dahua has established that it made a mistake when setting forth the severance payment as $680,000 per month for sixteen months rather than $680,000 payable over sixteen months. The first set of documents Zhejiang prepared included no payment at all for Zhang's separation (offering him only the opportunity to consult). The second set of documents contemplated compensation payable under the consulting agreement only. Le Regulski then acknowledged her misunderstanding and redrafted the documents to reflect Zhejiang's intent to provide for severance payments for the balance of the term of the 2015 Employment Agreement. Contemporaneous e-mail communications between Yue and Le Regulski corroborate this view: while the draft did not include any dollar amounts, it did specify that Zhang would receive "the 16 months of his salary as severance, regardless of whether he provides consulting services, and then he will get a separate consulting fee for his consulting services." Tr. Ex. 11 at 1270.

The discrepancy between $10,880,000 (the amount in the agreement) and the initial zero dollar offer, with no discussions of intermediate offers, supports Dahua's claim of mistake. It also is apparent how that mistake occurred. Le Regulski (and likely Yue) did not know the amount of Zhang's salary in the 2015 Employment Agreement. Zhejiang management relayed to Yue the $680,000 figure, without explaining that this was the total amount, and not the monthly salary remaining under Zhang's employment contract.

Dahua has also established that the mistake was mutual or that Zhang had reason to know of the mistake. First, the sticking point in the negotiations between the parties was not the amount of severance pay but the termination of Zhang's employment.[14] While Zhang could have

---

[14] Any dispute about the Zhejiang stock was a nonissue. The parties had an unwritten agreement to take care of the outstanding stock compensation separately and through a cash transfer in China.

anticipated that Dahua would sweeten its offer slightly to resolve the negotiations, Zhang had no

reason to think that Dahua would increase the severance from zero to $10,880,000. Second,

while the evidence supports Zhang's claim that keeping him quiet while Zhejiang or Dahua

closed the Lorex deal and resolved the matters around a security flaw benefitted Zhejiang and

Dahua by more than that amount, it does not support the notion that Zhejiang and Dahua – which

had a sizable team working hard to get what the company exactly what it wanted -- would have

offered the large sum, rather than a much smaller amount, to buy Zhang's silence and

cooperation.

      Zhang's further argument that he would not have accepted the deal for $680,000 because

it amounted to less, rather than more, than he was entitled to under the 2015 Employment

Agreement has some appeal. As the strategy memo had noted, absent misconduct (of which there

was no evidence presented at trial) Zhang was entitled to not only the $680,000 if he was

terminated during the contract term but also damages, including those he would suffer on the job

market looking for work as a candidate who had been terminated from his last job. And Zhejiang

had no non-disclosure or no-compete provisions in the 2015 Employment Agreement to limit

Zhang's post-termination activities. But, read together with the 2017 Employment Agreement,

the answer is apparent: Dahua had convinced Zhang that he retained that protection in the form

of a new employment agreement with a two-year term, plus additional compensation for his new

role. This assurance was false, for without the protective language in the 2015 Employment

Agreement, Dahua was free to terminate him, with payment of the balance of the two year term,

but without additional damages, and Zhang was locked into a non-compete. And that is what

Dahua did as soon as he no longer posed a risk to closing the Lorex deal. But Zhang's mistaken

belief that he had obtained meaningful protections in the 2017 Employment Agreement explains

why it was not illogical for him to accept the Release with all its new restrictions for only the $680,000 that he would have been entitled to regardless. And if Zhang realized that the Release Agreement, as written, provided for $680,000 per month, he had reason to know of the mistake. While his silence and cooperation may well have been of significant value to Zhejiang, Zhang had reason to know, from his own prior experience dealing with Fu and Zhejiang, that the company would not jump to such a large number without first trying to buy his silence and cooperation for some lesser amount.

Dahua's defense fails, however, because recission of a contract is available only to a contracting party that did not bear the risk of mistake. Covich, 8 Mass. App. Ct. at 749; Dahua Tech., 988 F.3d at 542.

Under Massachusetts law, "[a] party bears the risk of a mistake when . . . he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient . . . ." Greene, 794 F.3d at 148 (1st Cir. 2015) (quoting Restatement (Second) of Contracts § 154); Dover Pool & Racquet Club, Inc. v. Brooking, 366 Mass. 629, 633, 322 N.E.2d 168 (1975) (where the contract has no risk assignment then the question is whether the party entered into the contract with "conscious ignorance or deliberate risk-taking"). And where the mistake relates to a term ascertainable from the written agreement, a party to a contract is "required to read or assume the risk of not reading" the contract. Greene, 794 F.3d at 146 (finding that despite "facial similarity between contracts," employee assumed the risk of mistake where subsequent employment agreement referred to different set of policies than previous agreements). Moreover, a party bears the risk of a mistake when "the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so." Restatement (second) of Contracts § 154(c) (1981); see also Lawton v.

Dracousis, 14 Mass.App.Ct. 164, 172-73, 437 N.E.2d 543 (1982) ("Considering all the circumstances of the controversy, especially the absence of any wrongdoing by [the party not raising the defense], we see no justification for allocating the risk of the mistake to [the party not raising the defense] by allowing [the party asserting the defense] to rescind the sale"); AECOM Tech. Servs. Inc. v. Mallinckrodt LLC, 117 F. Supp. 3d 98, 111 (D. Mass. 2015). ("[Recission's] equitable character places it in the sound discretion of the court amid the total circumstances of the dispute").

Here, Dahua bore the risk of mistake in the Release Agreement. Dahua drafted the Release Agreement with a full panoply of lawyers. Fu left those lawyers operating without any information as to the dollar amounts to include in the agreement until the very end of the negotiations (as evidenced by the blanks relating to dollar amounts in the earlier drafts), and even then, management offered Yue no context or explanation for the number. It appears that Zhejiang was attempting to keep confidential from the attorneys (and perhaps others on the team) Zhang's salary under the 2015 Employment Agreement. When management then told Yue to insert $680,000 in the contract (where the blank appeared for a monthly payment), she had no reason to know that management intended for her to enter 1/16 of that amount or even that $680,000 was the total salary remaining on the 2015 Employment Agreement. Moreover, Fu's decision to then approve and sign the Release Agreement where it was presented to him in a language he could not read or understand—despite translation being an option—indicates he entered into the agreement with the kind of "deliberate risk taking" that results in assignment of the risk. Dover Pool & Racquet Club, 366 Mass. at 633. Accordingly, Dahua bore the risk of mistake as to the dollar amount in the Release Agreement.

The court finds further that the risk of mistake is properly allocated to Dahua based on the totality of circumstances. "Courts have traditionally applied discretion in affording relief by way of rescission, as they have with most equitable remedies." Worcester Heritage Soc., Inc. v. Trussell, 31 Mass. App. Ct. 343, 346, 577 N.E.2d 1009 (1991); Browning-Ferris Indus., Inc. v. Casella Waste Mgmt. of Massachusetts, Inc., 79 Mass. App. Ct. 300, 313, 945 N.E.2d 964 (2011) (Rescission's "equitable character places it in the sound discretion of the court amid the total circumstances of the dispute"). Zhejiang and Dahua knew that Zhang was entitled to continued employment with job protection and damages for early termination under the 2015 Employment Agreement. The team charged with terminating Zhang spent hours drafting documents to ensure that Zhang lost those protections and contract rights, replacing them with an arrangement that Zhang believed would continue those protections (albeit working for Dahua, rather than Zhejiang) but that Dahua knew would allow it to terminate Zhang a few months later. If the court were to allow Dahua to void the instrument, Dahua and Zhejiang would be unjustly enriched, where they have the benefit of a release for what would have been a wrongful termination under the 2015 Employment Agreement and Zhang's silence, cooperation, and non-competition under the new contracts. Zhang, in turn, would be harmed, where the practical result would be that his employment with Zhejiang will have been terminated without payment of damages due under the 2015 Employment Agreement and he will have provided the benefit of the non-compete and other contract terms to Dahua and Zhejiang without compensation. Accordingly, Dahua's defense fails where at formation it bore the risk of mistake.

However, before entering judgment, the court seeks further briefing from the parties on the following question: Having found that there was no oral agreement in 2017 prior to the signed documents, that the parties were mutually mistaken as to the severance term in the

Release Agreement,[15] but that Dahua's defense fails because Dahua bore the risk of such mistake, does the court have authority to fashion an appropriate remedy as a matter of equity or must the court enforce the agreement as written as a matter of law?

### III.   Motion for Judgment on Partial Findings

Zhang filed a Motion for Judgment on Partial Findings [Doc. No. 153] at the close of Dahua's case. The court reserved judgment on that motion until trial was complete and post-trial motions briefed. In light of the court's findings as to Dahua's claims, this motion is now denied as moot.

### IV.   Conclusion

For the foregoing reasons, the court will enter judgment against Dahua on its claims for reformation and breach of the implied covenant of good faith and fair dealing. The court reserves judgment as to Zhang's breach of contract counterclaim against pending further briefing from the parties. The parties shall promptly confer and submit a proposed briefing schedule on the question posed by the court.[16]

IT IS SO ORDERED.

October 21, 2022                                      /s/ Indira Talwani
                                                     United States District Judge

---

[15] Or at a minimum, if Zhang was not mistaken that he knew or should have known that Dahua did not intend for the Release Agreement to provide severance in the amount of $680,000 per month for sixteen months.

[16] The parties may include in their filing a joint request for mediation before a magistrate judge.