# United States Court of Appeals
## For the First Circuit

────────────

No. 24-1350

DAHUA TECHNOLOGY USA, INC.,

Plaintiff, Appellant,

v.

FENG ZHANG,

Defendant, Appellee.

────────────

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Indira Talwani, U.S. District Judge]

────────────

Before

Rikelman, Lynch, and Aframe,
Circuit Judges.

────────────

Daron L. Janis, with whom Daryl J. Lapp and Locke Lord LLP were on brief, for appellant.

Benjamin Flam, with whom Philip J. Gordon and Gordon Law Group LLP were on brief, for appellee.

Jeffrey M. Lipshaw, Suffolk University Law School, on brief for Contract Law Scholars, amicus curiae.

────────────

May 12, 2025

────────────

AFRAME, <u>Circuit Judge</u>.  This is the second appeal in a protracted contract dispute between Dahua Technology USA, Inc. ("Dahua") and Feng "Frank" Zhang, a former Dahua executive.  <u>See Dahua Tech. USA, Inc.</u> v. <u>Zhang</u>, 988 F.3d 531, 539-40 (1st Cir. 2021).  Zhang alleges that Dahua breached its obligation to pay him severance of $680,000 per month for sixteen months.  Dahua maintains that the parties only intended Zhang to receive a total severance of $680,000, paid in sixteen monthly installments.

Dahua sued under diversity jurisdiction and asserted claims for reformation of the relevant contract and breach of the implied covenant of good faith and fair dealing.  Zhang counterclaimed for breach of contract.  After this Court vacated a grant of summary judgment in Dahua's favor, the parties proceeded to an eleven-day bench trial on whether unilateral or mutual mistake infected the severance provision at issue.  Ultimately, the district court concluded that the severance provision contained a mistake that could not be fixed under Massachusetts law and therefore must be enforced "as written." <u>Dahua Tech. USA, Inc.</u> v. <u>Zhang</u>, No. 1:18-CV-11147-IT, 2024 WL 1075066, at *1 (D. Mass. Mar. 12, 2024).  The district court accordingly entered judgment for Zhang in the amount of $10,200,000, plus prejudgment interest.  Dahua appeals.  Because we conclude that the inartfully drafted severance provision is ambiguous, we vacate the judgment

and remand for this dispute to be resolved consistent with extrinsic evidence of the parties' intent.

## BACKGROUND

We begin by summarizing "the relevant facts as found by the district court . . . consistent with record support." <u>Nevor</u> v. <u>Moneypenny Holdings, LLC</u>, 842 F.3d 113, 116 (1st Cir. 2016).

Dahua is a United States subsidiary of Zhejiang Dahua Technology Co., Ltd. ("Zhejiang"), a publicly listed Chinese surveillance technology company based in Hangzhou, China. Dahua maintains corporate offices in Waltham, Massachusetts. In January 2016, Zhang assumed an executive role at Dahua as its Chief Strategy Officer, Vice President, and President of North American and Enterprise Sales.

Zhang's employment terms were set forth in a single-page agreement dated November 5, 2015 (the "2015 Employment Agreement"). Zhang was to receive a one-time grant of Dahua common stock and an annual base salary of $510,000 for a three-year employment term. The 2015 Employment Agreement provided that Zhang's annual base salary was "conditionally guaranteed," meaning that it remained payable in full even if the company terminated Zhang for cause.[1]

---

[1]    The 2015 Employment Agreement contained a carveout in the event of a termination for "illegal conduct or company misconduct," in which case Zhang was to "be compensated for the

In mid-2017, Zhejiang's Board of Directors decided to remove Zhang from the day-to-day management of its North American business. Zhejiang's leadership, headed by founder and chairman Liquan Fu, strategized with Zhejiang's outside and in-house counsel on how best to minimize the risks presented by Zhang's early removal.

These discussions centered on two primary concerns. First, Zhejiang's lawyers understood the company's potential exposure for terminating the 2015 Employment Agreement, which they believed could include not just the value of Zhang's remaining conditionally guaranteed base salary, but also damages arising from the loss of various benefits and a guaranteed employment period. Second, counsel flagged that the 2015 Employment Agreement did not contain any restrictive covenants to prevent a potentially disgruntled Zhang from publicizing certain security vulnerabilities that the company had concealed -- a risk heightened by Zhang's role in driving the company's negotiation of an important strategic acquisition.

Ultimately, Zhejiang's lawyers counseled that mitigating these concerns would require providing Zhang a "[b]aseline . . . severance package" that included (1) compensation for the salary, bonus, and other benefits due to Zhang through the end of his

---

duration of [his] employment and not receive any additional compensation."

three-year employment term; and (2) "[a]dditional compensation to entice [Zhang] to release all claims against Dahua."

In late August 2017, Fu traveled to Massachusetts to negotiate with Zhang the conditions for Zhang's removal from his executive role. Fu was accompanied by several members of the Zhejiang team, including Zhejiang's in-house counsel Haiyan Yue. Fu revealed the purpose for his visit to Zhang on the drive from the airport to his hotel when he told Zhang that he was "considering asking . . . young guys to run the business."

Fu and Zhang continued their discussion the next day at Fu's hotel. Fu told Zhang that he wanted Zhang to move to a different role within Zhejiang and offered Zhang a "senior management" position at Zhejiang's headquarters in China. When Zhang declined, citing concerns about disrupting his children's education, Fu instead offered Zhang a senior company advisor role in the United States. Zhang indicated his interest in that position but wanted to know first how the company intended to resolve the remaining terms of his 2015 Employment Agreement. When Fu advised that the company would "follow whatever the [2015 Employment Agreement] says," Zhang responded: "If [you] can take care of the agreement, I'm ok." Zhang then asked Fu what he would be asked to sign to effectuate the change, and Fu said that the company would "make sure [Zhang was] comfortable [and] treat [him] well."

Following this conversation, Fu stepped away to make a phone call. When Fu returned, he told Zhang that they were "all set." Attorney Yue subsequently emailed Dahua's outside counsel, writing: "It's been decided: [Zhang] will serve as a consultant. Dahua will pay him the remaining 16[-] month salary plus a monthly consulting fee. The consulting period is 2 years."

At Dahua's Waltham office later that day, Attorney Yue presented Zhang and Fu with drafts of a separation agreement and a consulting agreement. Under the terms of the proposed agreements, Zhang's employment with Zhejiang would terminate and he would be re-engaged by Dahua as an outside consultant, paid hourly for ad hoc projects on an at-will basis. The agreements did not provide any compensation for Zhang's remaining entitlements under the 2015 Employment Agreement. Zhang declined to sign the agreements on the ground that the proposed terms were "not what [he had] discussed" with Fu earlier that morning, reminding Attorney Yue that Fu had said the company would "treat [him] well."

After further internal discussions, Zhejiang's attorneys prepared two new letter agreements for Zhang's consideration. The first was a release agreement (the "Release Agreement"). The second was a new employment agreement (the "2017 Employment Agreement" and, together with the Release Agreement, the "2017 Agreement").

The Release Agreement purports to "memorialize[] the terms . . . agreed to with respect to the termination of [the 2015 Employment Agreement]" and includes, inter alia, a general release of claims, a non-competition clause, a confidentiality clause, and a mutual non-disparagement clause. In exchange for executing the contract and complying with its terms, Zhang was to receive severance under the following provision:

> Payments. In consideration for your execution, non-revocation and compliance with this Agreement, the Company agrees to make monthly severance payments to you in the amount of $680,000 for sixteen (16) months following the offer termination [d]ate (the "Severance Period"), payable subject to standard payroll deductions and withholdings on the Company's ordinary payroll dates over the Severance Period. . . .

The 2017 Employment Agreement sets forth the terms of Zhang's "new position" as a Dahua "Senior Corporate Advisor." In this role, Zhang was to "participat[e] in forward looking projects but [] not be involved in the day-to-day business operations of [Dahua]." The contract provides that Zhang would receive his new Senior Corporate Advisor salary "at the rate of $10,000 bi-weekly, which equates to $240,000 on an annualized basis."

Attorney Yue presented the Release Agreement and 2017 Employment Agreement together for Zhang and Fu's consideration. After about ten to fifteen minutes, Zhang and Fu signed both contracts without further discussion.

Zhang's employment as a senior corporate advisor to Dahua commenced on August 29, 2017. In the following months, Dahua continued to pay Zhang in monthly amounts consistent with his annual base salary under the 2015 Employment Agreement (i.e., at the rate of $510,000 per year), as well as his new salary under the 2017 Employment Agreement (i.e., at the rate of $240,000 per year). On January 10, 2018, Zhang received an email from Dahua's human resources department informing him of his immediate termination. Attached to the email was a new separation and release agreement that the company asked Zhang to review and sign. The contract, if executed, would have superseded the 2017 Agreement and entitled Zhang to "severance payments . . . in the amount of $910,000."

Zhang refused to sign the new agreement and instead requested "acceleration of the agreed to severance amount" set forth in the Release Agreement. Zhang's lawyers followed with a formal demand letter asserting that, under the 2017 Agreement, Dahua was "already contractually obligated to pay Mr. Zhang over $11,000,000." Zhejiang's counsel responded that she had "just learned" of a "scrivener's error in the Release Agreement," the apparent effect of which gave Zhang "a monthly severance payment of $680,000 for 16 months, rather than what the parties intended, which was [for Zhang to receive] a monthly severance payment of $42,000 for 16 months, totaling $680,000." Dahua requested that

Zhang execute a proposed amendment to the Release Agreement "[t]o correct [the] scrivener's error."   When Zhang refused, Dahua initiated the instant litigation.

## **THE LITIGATION**

Dahua brought this diversity action asking the district court to declare the Release Agreement "unenforceable" on the grounds that the severance provision "contains a scrivener's error that results from [a] mutual mistake of the parties."  Dahua sought reformation of the severance provision "to reflect the intent of the parties" by providing for "monthly severance payments to [Zhang] in the amount of $42,500 for the 16-month period following August 28, 2017, totaling $680,000."  Dahua also alleged that Zhang breached the implied covenant of good faith and fair dealing by "maintaining that the [Release Agreement] as-written reflects the intent of the parties."   For his part, Zhang counterclaimed for breach of contract based on Dahua's "refus[al] to pay [him] in accordance with the terms of [the Release Agreement]."

The parties filed cross-motions for summary judgment. The district court initially granted judgment for Dahua on all counts, finding no genuine dispute of material fact that "a unilateral, if not mutual, mistake permeated the [Release Agreement]," and ordered reformation of the contract per Dahua's request.  Dahua Tech. USA, Inc. v. Zhang, 433 F. Supp. 3d 41, 47 (D. Mass. 2020).  The court also entered judgment for Dahua on its

claim against Zhang for breach of the implied covenant of good faith and fair dealing. Id. Zhang appealed and this Court held, inter alia, that the district court erred in granting summary judgment to Dahua because there were several disputed issues of material fact relating to the viability of any mistake defense. Dahua Tech., 988 F.3d at 539-40.

On remand, the case was assigned to a different judge, and the parties proceeded to a bench trial to resolve the core factual disputes identified by this Court. See id. The parties agreed that the district court should focus on the following three factual questions:

> 1.   Whether at the time of signing the Severance Agreement, Fu believed that he was offering $680,000 per month for sixteen (16) months or $680,000 total over a span of sixteen (16) months as a term of the Severance Agreement.

> 2.   Whether at the time of signing the Severance Agreement, Zhang believed that Fu was offering $680,000 per month for sixteen (16) months or $680,000 total over a span of sixteen (16) months as a term of the Severance Agreement.

> 3.   If . . . Dahua made a drafting mistake, whether Zhang knew or had reason to know of that mistake at the time he executed the Severance Agreement.

After the trial, the district court answered these questions in Dahua's favor. See Dahua Tech. USA, Inc. v. Zhang, No. 1:18-cv-11147-IT, 2022 WL 12370835, at *13-14 (D. Mass. Oct.

21, 2022).  Nevertheless, these answers did not deliver Dahua the relief it sought because the court concluded that, under Massachusetts law, it could not reform or rescind the Release Agreement on grounds of unilateral or mutual mistake.  Id. at *12, 15-16.

The district court's factual determinations as to the parties' misimpressions regarding the amount of the severance payment did not factor into its reformation analysis, which focused instead on whether Dahua had clearly demonstrated that the parties had reached a prior, express agreement "to which the Release Agreement [could] be reformed."  Id. at *11.  The court found that, prior to the moment when Zhang and Fu signed the final version of the 2017 Agreement, the parties had agreed only that Zhang "would give up" his executive-level position "and would instead serve as a senior corporate advisor" -- a role for which "he would be paid an additional $240,000 per year for two years while [he continued] to receive the salary and benefits for the remaining sixteen months of the [2015 Employment Agreement]."  Id.  The court held that Fu and Zhang's alignment on just these terms could not provide the basis for reforming the severance provision under Massachusetts law where the parties "did not discuss terminating Zhang's employment with Zhejiang and did not discuss a Release Agreement at all."  Id.; see Sancta Maria Hosp. v. City of Cambridge, 341 N.E.2d 674, 681 (Mass. 1976) (holding that a court should "not

decree a reformation unless [it is] convinced that the parties expressed agreement and an intention to be bound in accordance with the terms that [it is] asked to establish and enforce").[2]

In the alternative, the district court considered whether Dahua could obtain rescission of the Release Agreement because of either mutual or unilateral mistake -- a remedy which, unlike reformation, does not require the parties to have reached a prior agreement. Dahua Tech., 2022 WL 12370835, at *13-16; see LaFleur v. C.C. Pierce Co., 496 N.E.2d 827, 830-31 (Mass. 1986). The court concluded that Dahua's claims of mistake were supported by, inter alia, its lawyers' contemporaneous internal communications and "[t]he discrepancy between $10,880,000" -- i.e., the amount of severance allegedly required by the Release Agreement's plain terms -- "and the initial zero dollar offer" in the first draft agreement that Attorney Yue gave to Zhang. Dahua Tech., 2022 WL 12370835, at *14. The court reasoned that this discrepancy should have alerted Zhang to Dahua's mistake because he should have known, based on "his own prior experience dealing with Fu and Zhejiang," that Zhejiang would not jump to offer almost $11 million in severance when it started by offering nothing. Id.

---

[2]     In the first appeal, Zhang challenged the district court's application of Massachusetts law to the Release Agreement. Dahua Tech., 988 F.3d at 537-58. We affirmed the district court's determination that Massachusetts law governs. Id. at 538.

The district court thus held that Dahua had established both that "it made a mistake when setting forth the severance payment as $680,000 per month for sixteen months rather than $680,000 payable over sixteen months," and that "the mistake was mutual or that Zhang had reason to know of the mistake." Id. at *14. Ultimately, however, the court concluded that the parties' mistakes could not insulate Dahua from liability on Zhang's breach of contract claim because Dahua, having "drafted the Release Agreement with a full panoply of lawyers," bore the risk of mistake.[3] Id. at *15; see Restatement (Second) of Contracts § 152 (Am. L. Inst. 1981) ("Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake . . . ."). The court also reasoned that the equities supported denying rescission because voiding the severance provision would effectively deny Zhang compensation for agreeing to new restrictive covenants from which Dahua had already received the benefit of Zhang's compliance,

---

[3]    In reaching this conclusion, the court also highlighted evidence that Dahua had selectively withheld specific dollar amounts from the lawyers tasked with preparing the Release Agreement until the eleventh hour, and that Fu had approved and signed the agreement even though Fu could not "read or understand" English, the language used in the Release Agreement. Dahua Tech., 2022 WL 12370835, at *15.

i.e., Zhang's silence during the company's strategic acquisition negotiations, supra at 4.  Dahua Tech., 2022 WL 12370835, at *16.

The district court accordingly entered judgment against Dahua on its claims for reformation and breach of the implied covenant of good faith and fair dealing.  Id. at *16.  The court, however, stopped short of entering judgment for Zhang on his breach of contract counterclaim and instead solicited additional briefing from the parties on the following question:

> Having found that there was no oral agreement in 2017 prior to the signed documents, that the parties were mutually mistaken as to the severance term in the Release Agreement [or, at a minimum, . . . that Zhang knew or should have known that Dahua did not intend for the Release Agreement to provide severance in the amount of $680,000 per month for sixteen months, but that Dahua's defense fails because Dahua bore the risk of such mistake], does the court have authority to fashion an appropriate remedy as a matter of equity or must the court enforce the agreement as written as a matter of law?

Id. at *16 & n.15 (bracketed language from footnote).

Dahua's initial response proposed a handful of equitable remedies that the district court could apply to avoid an outcome resulting in "an unintended $10 million windfall" to Zhang, such as implying a quasi-contract to provide for a total severance amount of $680,000.  Dahua then followed with another filing suggesting the court could "avoid the necessity of reforming the writing by viewing the issue as one of interpretation."

The district court rejected Dahua's contract interpretation argument on waiver grounds and on the merits. <u>Dahua Tech.</u>, 2024 WL 1075066, at *4. The court also found Dahua's other proposed equitable solutions unpersuasive and accordingly concluded that there was no basis for "overrid[ing]" the severance provision as written. <u>Id.</u> at *5-6. Finally, having held that "the terms of the Release Agreement control, including the severance provision in its entirety," <u>id.</u> at *7, the court entered judgment against Dahua on Zhang's breach of contract claim in the amount of $10,200,000.00, with prejudgment interest of $6,753,787.88, for a total award of $16,953,787.88. This second appeal followed.

On appeal, Dahua presents several challenges to the district court's rulings. We focus on only one: Dahua's argument that the district court incorrectly concluded that the Release Agreement's severance provision unambiguously promised Zhang payments of $680,000 each month for sixteen months. In our view, the Release Agreement made no such unambiguous promise.

## <u>ANALYSIS</u>

Though the parties have framed much of this litigation around Dahua's claim for reformation of the Release Agreement's severance provision, it is Dahua's contract interpretation argument that presents the logical starting point for our analysis. After all, the court's judgment against Dahua hinges

on its view that the Release Agreement, as written, unambiguously requires Dahua to pay Zhang $10.2 million in severance.  If Dahua is correct that the Release Agreement is unclear, then the court must construe the meaning of the severance provision in accord with extrinsic evidence of the parties' intent.  In that scenario, the severance provision would be interpreted by considering evidence of the surrounding circumstances, making it unnecessary to analyze the availability of equitable tools (e.g., reformation or rescission) to rewrite or void the contract.[4]

We thus consider the merits of Dahua's contention that the Release Agreement is ambiguous as a matter of law, and that the district court should have considered extrinsic evidence to determine the severance provision's meaning.  Before doing so, however, we must first address Zhang's contention that Dahua has waived this argument altogether.

## A.    Waiver

As noted above, the district court initially reserved judgment on Zhang's breach of contract counterclaim pending additional briefing on whether, given its factual findings, the

---

[4]    While "reformation and interpretation have much in common," Arthur Corbin et al., 5 Corbin on Contracts § 24.2 (2025), they are mutually exclusive in their application.  Interpretation requires the court to "determine the meaning of [the] existing words" of a written agreement; reformation, by contrast, asks the court to "alter the words of the document" so that it "express[es] to others the meaning that both parties had intended."  Id.

court had "authority to fashion an appropriate remedy as a matter of equity or must . . . enforce the [Release Agreement] as written as a matter of law." <u>Dahua Tech.</u>, 2022 WL 12370835, at *16. Before the court ruled on these questions, Dahua directed the court's attention to commentary from the Restatement on the relationship between reformation and contract interpretation:

> In some instances where it might appear that both parties are mistaken with respect to the reduction to writing of a prior agreement, interpretation of the writing will show that the mistake is only apparent and not real. Where, for example, the parties use language in the writing in an unusual way, interpretation of that writing in accord with the meaning attached by the parties will protect their expectations, and reformation is unnecessary. In a borderline case, a court may avoid the necessity of reforming the writing by viewing the issue as one of interpretation.

Restatement (Second) of Contracts § 155 cmt. b.

Dahua invited the district court to apply this commentary by "us[ing] the rules of contract interpretation and ambiguity" to resolve the parties' dispute. In making this argument, Dahua acknowledged that it had "at times . . . disclaimed asserting ambiguity . . . to refocus the [c]ourt on its arguments regarding mistake when Zhang conflated mistake with ambiguity in his briefing," but contended that the proper interpretation of the Release Agreement was nonetheless an open issue throughout the litigation. Zhang filed a response objecting

to Dahua's "delinquent [ambiguity] argument" on waiver grounds and on the merits.

In its final ruling, the district court agreed with Zhang that it was too late for Dahua to claim ambiguity in the Release Agreement, particularly given that Dahua had disclaimed making such an argument earlier in the litigation. Dahua Tech., 2024 WL 1075066, at *4. The court nevertheless proceeded to consider the ambiguity argument on the merits and determined that the severance provision was unambiguous as a matter of law. Id. Zhang submits that Dahua's ambiguity claim on appeal fails for these same reasons.

Ordinarily, "[t]heories not timely raised in the trial court cannot be raised on appeal." Robb Evans & Assocs., LLC v. United States, 850 F.3d 24, 36 (1st Cir. 2017). This rule would ordinarily preclude appellate consideration of a theory raised for the first time in a post-trial submission. See, e.g., W.R. Cobb Co. v. V.J. Designs, LLC, 130 F.4th 224, 240 (1st Cir. 2025) (enforcing waiver of mutual mistake theory where a party failed to "advance[] such a claim . . . prior to or during the trial itself"). But even our most stringent waiver rules "admit[] of an occasional exception." Nat'l Ass'n of Soc. Workers v. Harwood, 69 F.3d 622, 627 (1st Cir. 1995). Here, unique circumstances favor allowing such an exception.

As an initial matter, Dahua's ambiguity claim was fully briefed before the district court, and the court addressed it on the merits.  This is therefore not a case in which, by neglecting to timely raise an issue, a party denied its adversary and the trial court "the opportunity to address and to decide [the] issue[] in the first instance before an appellate court steps in."  Holsum de P.R., Inc. v. ITW Food Equip. Grp., LLC, 116 F.4th 59, 65 (1st Cir. 2024).  We have observed that the concerns generally animating our strict enforcement of waiver rules -- namely, considerations of fairness and judicial economy -- carry less weight under such circumstances.  See id. at 66 (noting that the fact that a district court has "address[ed] an argument, even one that a party has not presented squarely, . . . undermines the justifications for enforcing what might otherwise be a party's waiver"); see also id. (declining to enforce plaintiff's waiver of an argument raised for the first time in a surreply to a defendant's motion for attorneys' fees "because the district court reached and decided the issue").

Here, however, we must also consider whether we can look past the inconsistency between Dahua's current assertion of ambiguity and its initial position that it was not advancing such an argument.  Ordinarily, we would hold a party to the consequences of its decision to press one theory to the exclusion of another.  See Genereux v. Raytheon Co., 754 F.3d 51, 59 (1st Cir. 2014) ("[W]hen a litigant commits to a theory of the case and sticks to

that theory past the point of no return, he cannot thereafter switch to a different theory simply because it seems more attractive at the time."). We decline to do so here for three reasons.

First, Dahua raised its ambiguity claim after the district court specifically asked the parties for briefing on whether it could "fashion an appropriate remedy as a matter of equity" or was instead required to "enforce the [Release Agreement] as written as a matter of law." Implicit in the court's request was an invitation to offer arguments on whether the court could award Zhang an amount of severance different from $680,000 per month. By explaining that the court could "use the rules of contract interpretation . . . as a different lens to view the parties' dispute over whether the inapt writing accurately expresses their mutual intent," Dahua provided a responsive argument. In these circumstances, we think it appropriate to excuse Dahua from its earlier statements framing the relevant issue as one of mistake, especially where the pertinent Restatement provision regarding reformation recognizes that mistake and ambiguity are often closely connected. See Restatement (Second) of Contracts § 155 cmt. b; see also 5 Corbin on Contracts § 24.2 (observing that "reformation and interpretation have much in common" and that "the line between interpretation and reformation is not always bright and easy to find").

Second, and more importantly, the meaning of the contested language in the severance provision is an unavoidable issue for any appellate decision resolving this dispute. For example, to review the ruling against Dahua on its reformation claim, we would need to consider whether the district court correctly concluded that the language of the severance provision failed to "express the agreement as originally intended" by the parties. OneBeacon Am. Ins. Co. v. Travelers Indem. Co. of Il., 465 F.3d 38, 42 (1st Cir. 2006). Likewise, reviewing the judgment for Zhang on his breach of contract counterclaim requires us to assess whether the language of the severance provision entitles Zhang to $10.2 million in severance as a matter of law. See Fenoglio v. Augat Inc., 254 F.3d 368, 370 (1st Cir. 2001) (noting that review of challenged award of change-of-control benefits for executive turned on construction of executive's entitlements under the relevant contracts).

Given that the resolution of these issues necessarily depends on how one construes the amount of severance described by the Release Agreement, we do not think it appropriate to bypass a challenge to the district court's interpretation of that language as unambiguous. See CMM Cable Rep, Inc. v. Ocean Coast Props., Inc., 97 F.3d 1504, 1524 (1st Cir. 1996) (addressing an argument not "explicitly raise[d]" below because the issue was "inextricably intertwined with the issues raised by [the]

appeal"); see also Parmenter v. Prudential Ins. Co. of Am., 93 F.4th 13, 22 (1st Cir. 2024) (conducting a "journey into the meaning of a term" and finding it ambiguous as a matter of law notwithstanding the parties' mutual agreement that "the language at issue [was] plain and unambiguous").

Third, we are more inclined to look past a waiver when the issue belatedly raised presents a question of law.  See Nat'l Ass'n of Soc. Workers, 69 F.3d at 627-28 (recognizing that one consideration in overlooking a waiver is whether "it can fairly be said that the . . . issue is purely legal in nature, and lends itself to satisfactory resolution on the existing record"); see also Montalvo v. González-Amparo, 587 F.3d 43, 48 (1st Cir. 2009) (similar).  The ambiguity issue raised here is a question of law arising from a developed record.  See Eigerman v. Putman Invest., Inc., 877 N.E.2d 1258, 1263 (Mass. 2007) ("The interpretation of a contract is a question of law for the court.").

For all these reasons, we view this as a rare instance in which it is appropriate to consider a claim belatedly raised below.  See Nat'l Ass'n of Soc. Workers, 69 F.3d at 628 (recognizing that it should only be the "occasional" case where the appellate court will overlook a litigant's failure to properly preserve an issue in the district court).  Accordingly, we turn to the merits of Dahua's ambiguity argument.

B.    **Interpreting the Severance Provision**

Our review of Dahua's contract interpretation claim is governed by a familiar legal framework.  To interpret a contract, a court "must first assess whether the contract is ambiguous," Sonoiki v. Harvard Univ., 37 F.4th 691, 703-04 (1st Cir. 2022) (quoting Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 783 (1st Cir. 2011)), which, as noted above, is "a question of law decided de novo by the reviewing court," id. (quoting Helfman v. Ne. Univ., 149 N.E.3d 758, 777 (Mass. 2020)).  Under Massachusetts law, a contractual provision is ambiguous "where the phraseology can support [a] reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken." Mercury Sys., Inc. v. S'holder Rep. Servs., LLC, 820 F.3d 46, 51-52 (1st Cir. 2016) (quoting Fashion House, Inc. v. K Mart Corp., 892 F.2d 1076, 1083 (1st Cir. 1989)).

To determine whether a particular contractual term is ambiguous, a court must "interpret [the at-issue] language in the context in which it was written and with reference to the objects sought to be accomplished, mindful that a contract should be construed [so as] to give it effect as a rational business instrument and in a manner which will carry out the intent of the parties." Homeowner's Rehab, Inc. v. Related Corp. V SLP, L.P., 99 N.E.3d 744, 754 (Mass. 2018) (cleaned up) (citation omitted). In executing these mandates, courts must avoid "isolating words

and interpreting them as though they stood alone," Starr v. Fordham, 648 N.E.2d 1261, 1269 (Mass. 1995) (citation omitted), and instead construe the disputed provision considering "the contract as a whole, 'the circumstances and background of its negotiation and execution,' and its purpose," Wilmot H. Simonson Co. v. Green Textiles Assocs., 755 F.2d 217, 220 (1st Cir. 1985) (quoting E. Coast Aviation Corp. v. Mass. Port Auth., 195 N.E.2d 545, 548 (Mass. 1964)).

Here, the severance provision provides that "the Company agrees to make monthly severance payments to you in the amount of $680,000 for sixteen (16) months." Dahua contends that the quoted language lends itself to two reasonable interpretations: one that requires sixteen monthly severance payments, each in the amount of $680,000 (the reading accepted by the district court), and another that requires a total severance amount of $680,000 paid over sixteen monthly payments (the reading Dahua asserts to be more reasonable under the interpretative rules of Massachusetts law). The district court rejected this argument, reasoning that Dahua's proposed alternative reading "would require the court to ignore the word 'monthly' in 'monthly severance provision,'" which would breach the interpretative canon that a contract should be construed "so that every word is given effect." Dahua Tech., 2024 WL 1075066, at *4 (quoting DeWolfe v. Hingham Ctr., Ltd., 985 N.E.2d 1187, 1195 (Mass. 2013)). "[F]or [this] reason alone," the court

determined that the provision had only one possible interpretation and declared it unambiguous as a matter of law.  Id.

Dahua contends that the district court construed the Release Agreement too narrowly and that the severance provision, when viewed in its proper context, plausibly supports either interpretation.  We agree.

To begin, we accept Dahua's unchallenged assertion that the Release Agreement and the 2017 Employment Agreement "were part of a single transaction" and thus "are to be treated as an integrated agreement setting forth the entire understanding reached by the parties." Wilmot H. Simonson Co., 755 F.2d at 220 (first quoting Chelsea Indus., Inc. v. Florence, 260 N.E.2d 732, 735 (Mass. 1970); then quoting Thomas v. Christensen, 422 N.E.2d 472, 476 (Mass. App. Ct. 1981)).  The court accordingly must "read[] the documents together, rather than construing each as if it stood alone," Donoghue v. IBC USA (Publ'ns), Inc., 70 F.3d 206, 212 (1st Cir. 1995), keeping in mind "the object[] sought to be accomplished," Homeowner's Rehab, Inc., 99 N.E.3d at 754.

By its plain language, the parties' agreement was designed to effectuate an early termination of Zhang's 2015 Employment Agreement with Zhejiang by hiring him as a Dahua senior corporate advisor.  Compare Release Agreement at 1 ("This letter agreement [] memorializes the terms . . . agreed to with respect to the termination of [the 2015 Employment Agreement]"), with 2017

Employment Agreement at 1 (identifying 2017 Employment Agreement as an offer to Zhang for "the new position of Senior Corporate Advisor"). To carry out this object, the integrated agreement provides Zhang with two forms of compensation. First, the Release Agreement includes the at-issue severance provision:

> <u>Payments</u>. In consideration for your execution, non-revocation and compliance with this Agreement, the Company agrees to make monthly severance payments to you in the amount of $680,000 for sixteen (16) months following the offer termination Date (the "<u>Severance Period</u>") . . . .

Second, the 2017 Employment Agreement includes a salary provision for Zhang's new advisor role:

> <u>Base Salary</u>. Your initial salary will be at the rate of $10,000 bi-weekly, which equates to $240,000 on an annualized basis.

The district court analyzed just the severance-payment provision and concluded that it supported only one meaning: that Dahua was to make sixteen severance payments to Zhang over the course of sixteen months, each in the amount of $680,000. <u>Dahua Tech.</u>, 2024 WL 1075066, at *4. Put differently, the district court adopted a reading that construed the word "monthly" as relating forward to modify "severance payments," thus making "monthly severance payments" the direct object of the provision. "[I]n the amount of $680,000," in turn, modifies that direct object, telling the reader that each monthly severance payment should be $680,000.

While that is a reasonable way to read the severance provision, it is not the only plausible reading. The text also supports a construction in which "monthly" relates backwards to modify "make," thus making "severance payments" (as opposed to "monthly severance payments") the direct object of the provision. When read in this manner, it is unclear whether $680,000 describes the monthly or total severance payment, as one can just as well make "severance payments" in the total amount of $680,000 or monthly payments in that amount. The immediate context does not resolve that ambiguity: "make monthly" and "for sixteen (16) months" indicate the frequency and duration of the payments, respectively, but neither phrase clarifies the intended amount.

Contrary to the district court's suggestion, this alternative construction does not require reading "monthly" out of the provision. As just noted, "monthly" may speak to the frequency with which severance payments are to be "ma[de]." In this construction, "monthly" provides important information for how the provision will be executed; specifically, it confirms that, during the life of the severance provision, Dahua will make payments on a specific, periodic basis. It is also grammatically correct since adverbs may modify verbs that they immediately follow (e.g., "make expeditiously"). See United States v. Cunningham, 630 F. Appx. 873, 878 n.6 (10th Cir. 2015) ("The general rule is that a modifier, like an adverb, is placed next to the word it

modifies."); see also DeWolfe, 985 N.E.2d at 1195 (rules of grammar are to be "generally adhered to" in interpreting a contract). We thus disagree with the basis on which the district court declared the provision plain. It is possible to interpret the severance provision in a way that "give[s] effect" to "every word" and still leaves ambiguous the total amount of severance owed. DeWolfe, 464 Mass. at 804.

There are additional interpretative canons that make Dahua's preferred construction plausible. One is the "[b]lack letter law teach[ing] that 'a construction . . . comport[ing] with the [a]greement as a whole is to be preferred even if it be thought that certain language, viewed only by itself, more readily suggests something else.'" Fashion House, Inc., 892 F.2d at 1083 (quoting (Spartan Indus., Inc. v. John Pilling Shoe Co., 385 F.2d 498, 499 (1st Cir. 1967)). Another is the principle that "related provisions may cast light on meaning." Nat'l Tax Instit., Inc. v. Topnotch at Stowe Resort & Spa, 388 F.3d 15, 19 (1st Cir. 2004).

Here, the two payment provisions in the 2017 Agreement -- i.e., the base salary provision in the 2017 Employment Agreement and the severance provision in the Release Agreement -- are inconsistent in their constructions. Zhang's new salary as a senior corporate advisor to Dahua is defined in reference to a total amount ($240,000) reduced to a specific periodic amount ($10,000 paid biweekly) to be paid for a certain

amount of time (two years).  Zhang's severance, by contrast, is defined only in reference to an amount ($680,000) to be paid at specified intervals (monthly) over a specified period (16 months). Dahua argues that the absence of a second dollar amount in the description of the severance payment adds uncertainty over whether the parties meant for $680,000 to represent the total amount of severance or the periodic amount to be paid at monthly intervals. We agree.

Dahua's alternative construction finds further support in the "background facts that explain the context in which the agreement was made."[5]  SAPC, Inc., 921 F.2d at 361 n.2.  Based on the circumstances of the transaction, it appears that Zhejiang's reason to pay Zhang $240,000 per year for two years to work as an

---

[5]    Considering such information in the context of our ambiguity analysis is permissible pursuant to the Massachusetts version of the parol evidence rule, under which a court may look to limited extrinsic evidence to find ambiguity before concluding that a contract is facially ambiguous.  SAPC, Inc. v. Lotus Dev. Corp., 921 F.2d 360, 361 n.2 (1st Cir. 1990) (citing Louis Stoico, Inc. v. Colonial Dev. Corp., 343 N.E.2d 872, 875 (Mass. 1976)); see Robert Indus., Inc. v. Spence, 291 N.E.2d 407, 409 (Mass. 1973) ("[A contract] is to be read in the light of the circumstances of its execution, which may enable the court to see that its words are really ambiguous."); cf. Cullinet Software, Inc. v. McCormack & Dodge Corp., 511 N.E.2d 1101, 1102 (Mass. 1987) ("The judge quite properly heard evidence to aid in the construction of the agreement, even before he decided whether the agreement was ambiguous.").  Though such evidence may not be used to "contradict, vary, or broaden an integrated writing," Kobayashi v. Orion Ventures, Inc., 678 N.E.2d 180, 184 (Mass. App. Ct. 1997), it may suggest that the writing is susceptible to more than one meaning, see Starr, 648 N.E.2d at 1269 n.11.

advisor on ad hoc projects was to encourage him to leave his management position on good terms. If, however, Zhejiang was willing to pay Zhang $10.2 million of severance in exchange for his separation and associated restrictions, it seems strange that the parties would view a comparatively trivial $480,000 as a necessary additional sweetener.[6] See Starr, 648 N.E.2d at 1269 n.11 (noting with approval that the Restatement (Second) of Contracts § 212 supports making a "determination of meaning or ambiguity . . . in the light of the relevant evidence of the situation and the relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties" (quoting Restatement (Second) of Contracts § 212 cmt. b)). Indeed, for Dahua to agree to pay Zhang $10.2 million in severance -- a sum nearly fifteen times greater than the amount of conditionally guaranteed salary remaining under the 2015 Employment Agreement -- only to keep him on salary as a consultant

---

[6] Of course, the severance amount was also contingent upon Zhang's release of claims and compliance with important restrictive covenants. But the 2017 Employment Agreement also contains a proprietary information provision barring Zhang from divulging any of the company's confidential information "to any person," both "during the term of [his] employment with the Company or thereafter." Thus, while Zhang's "silence and cooperation may well have been of significant value to Zhejiang," Dahua Tech., 2022 WL 12370835, at *14, it does not follow that $10.2 million necessarily represents the purchase price for keeping Zhang from disclosing potentially unflattering information.

for another two years, does not seem a particularly likely bargain for securing Zhang's amicable termination. See Fishman v. LaSalle Nat'l Bank, 247 F.3d 300, 302 (1st Cir. 2001) ("The presumption in commercial contracts is that the parties were trying to accomplish something rational." (citing Shea v. Bay State Gas Co., 418 N.E.2d 597, 601-02 (Mass. 1981))).

The district court recognized this business reality when it concluded that the plain meaning of the severance provision required a result that neither party intended. But this same information also affects the assessment of the ambiguity question. See supra n.5; see also Shea, 418 N.E.2d at 601 ("[W]e cannot ignore the basic rule of construction that [a court] must give effect to the parties' intentions and construe the language to give it reasonable meaning wherever possible."); cf. Cadle Co. v. Vargas, 771 N.E.2d 179, 366 (Mass. App. Ct. 2002) ("Common sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons." (quoting Fishman, 247 F.3d at 302-03)). For this reason and those discussed above, we conclude that the severance provision plausibly supports two interpretations and thus is ambiguous a matter of law.

Our conclusion leaves the question of next steps. Once a court concludes that a term at issue in a contract is ambiguous as a matter of law, the focus shifts to resolving that ambiguity. RCI Ne. Servs. Div. v. Bos. Edison Co., 822 F.2d 199, 202 (1st

Cir. 1987).  This is a question of fact to be made by a factfinder, the resolution of which turns on "the intent of the parties."  Id.

We appreciate that significant time and attention has already been expended to consider the parties' intent.  But to date, the intent question was considered only in the context of resolving Dahua's request for equitable remedies.  The parties should be provided the opportunity to make arguments and, if necessary, present additional evidence that bears on the correct interpretation of the ambiguous severance provision.  We thus remand for the district court to construe the severance provision based on evidence concerning the parties' intended meaning.[7]

### C.  Implied Covenant of Good Faith and Fair Dealing

This leaves only Dahua's claim that Zhang breached the implied covenant of good faith and fair dealing when he refused to sign an amendment to reform the purported scrivener's error in the Release Agreement.  As the district court correctly observed, "[t]he concept of good faith 'is shaped by the nature of the contractual relationship from which the implied covenant derives,'

---

[7]    We recognize that in rejecting the ambiguity claim below, the district court noted that, even if the provision were ambiguous, it would be inclined to construe that ambiguity against Dahua as the drafter of the Release Agreement.  While Dahua's role as drafter may be a relevant consideration, we note that "[a] prerequisite to the application of [that] rule is that the alternative interpretation placed upon the alleged ambiguity . . . be, under all circumstances, a reasonable and practical one."  James B. Nutter & Co. v. Est. of Murphy, 88 N.E.3d 1133, 1141 (Mass. 2018) (second alteration in original).

and the 'scope of the covenant is only as broad as the contract that governs the particular relationship.'"  <u>Young</u> v. <u>Wells Fargo Bank, N.A.</u>, 717 F.3d 224, 238 (1st Cir. 2013) (quoting <u>Ayash</u> v. <u>Dana-Farber Cancer Inst.</u>, 822 N.E.2d 667, 684 (Mass. 2005)).

Here, there is nothing in the 2017 Agreement that would impose a duty on Zhang to agree to or even consider a modification of Dahua's obligations thereunder.  <u>See</u> <u>Renovator's Supply, Inc.</u> v. <u>Sovereign Bank</u>, 892 N.E. 2d 777, 790 (Mass. App. Ct. 2008) (observing the importance of "limit[ing] the duties of the parties to the expressed and accomplished terms of their agreement").  Nor can Dahua sustain an implied covenant claim against Zhang based on the possibility that he knew that Dahua did not intend for the Release Agreement to provide severance in the amount of $680,000 per month for sixteen months.  <u>See</u> <u>id.</u> (reversing judgment on implied covenant claim where "actionable conduct related entirely to the formation" of an agreement "and not to the performance of the existing agreement").  Dahua's implied covenant claim thus fails regardless of how the underlying contract dispute is ultimately resolved.

<u>**CONCLUSION**</u>

For the reason stated, we **<u>vacate</u>** the judgment and **<u>remand</u>** for further proceedings, except for the district court's ruling

that Dahua's implied covenant of good faith and fair dealing claim

fails, which we **affirm**.    No costs are awarded.

     **So ordered**.